**Richard E. Weltman** (rew@weltmosk.com)
**Michael L. Moskowitz** (mlm@weltmosk.com)
**Debra Kramer** (dk@weltmosk.com)
**Adrienne Woods** (aw@weltmosk.com)
**WELTMAN & MOSKOWITZ, LLP**
*Proposed Attorneys for Debtor/Debtor-in-Possession*
270 Madison Avenue, Suite 1400
New York, New York 10016-0601
212.684.7800

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) |
| | ) |
| G.A.F. SEELIG, INC., | ) Chapter 11 |
| | ) |
| Debtor. | ) Case No. 17-46968-ess |
| | ) |

**AFFIDAVIT OF RODNEY P. SEELIG PURSUANT TO LOCAL**
**BANKRUPTCY RULE 1007-4 IN SUPPORT OF FIRST DAY MOTIONS**

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) ss.: |
| COUNTY OF QUEENS | ) |

I, Rodney P. Seelig, declare, pursuant to section 1746 of title 28 of the United States Code, as follows:

1.      I am the President and a board member of G.A.F. Seelig, Inc. ("Debtor") in the above-captioned case ("Chapter 11 Case") and, in such capacity, I am familiar with the day-to-day operations, business, and financial affairs of Debtor.

2.      I submit this declaration ("Declaration") pursuant to Rule 1007-4 of the Local Bankruptcy Rules for the Eastern District of New York ("Local Bankruptcy Rules") to assist the court and other parties in interest in understanding the circumstances that compelled the commencement of the Chapter 11 Case on the date hereof ("Petition Date") and in support of Debtor's petition ("Petition") for relief under Chapter 11 of Title 11 of the United States Code ("Bankruptcy Code").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with staff members of Debtor, Debtor's professional advisors, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning Debtor's operations and financial affairs. If called upon to testify, I would testify to the facts set forth in this Declaration and that I am authorized to submit this Declaration on behalf of Debtor.

4.      Section I of this Declaration provides a general overview of Debtor's business, organizational structure, capital structure, and the circumstances giving rise to the commencement of the Chapter 11 Case. Section II provides a summary of the motions anticipated to be filed by Debtor on the Petition Date. Section III lists the schedules of information required by Local Bankruptcy Rule 1007-4.

## I.     OVERVIEW OF THE DEBTOR

### A. Debtor

i.      Overview of Debtor's Business

5.      Debtor is a family-owned company engaged in the sale and distribution of fine foods and dairy products since 1871. Debtor currently leases 88,000 square feet of office, warehouse, manufacturing and distribution space under a lease which expires in mid-2018 with four (4) one-year renewal options. Debtor provides customers throughout the Tri-State area with all types of milk products, yogurts, juices, water, imported and domestic cheeses, purees, raviolis and pastas, oil and vinegars, chocolates and other food service items.  Debtor's sales range between $40 and $50 million dollars per year.

6.      Since its founding, Debtor expanded its customer base to include over 600 hotels, fine dining restaurants, corporate dining facilities, hospitals, baking manufacturers, the cruise

industry and other food service providers. Debtor prides itself on its ability to service the wide range of customer requirements for both products and delivery. Debtor's relationships with its customers and suppliers is paramount to its success. Debtor aims to be a one-stop source of related products to its customers. Ideas for new product offerings are often sourced from customers and suppliers, and by observing industry trends. Debtor's customers benefit from the convenience, flexibility and value Debtor's offers. The preservation of the Debtor's customers relationships is critical to the profitability and success of the Debtor's business, especially given the high degree of competition in the industry. A material disruption to the services provided by Debtor or the development of significant uncertainty in the market as to Debtor's ongoing ability to perform its obligations would threaten the viability of Debtor's business operations and damage the value of its assets.

7.     Generally, there is also a high degree of competition in the Debtor's industry. Debtor competes with numerous suppliers and providers, many of which have significantly greater financial and operational resources than Debtor.

ii.     Management and Employees

8.     Debtor has approximately eighty-six (86) employees, all of whom are at-will employees and most of whom are salaried employees. Debtor employs approximately sixty (60) union employees from Teamsters Local 584. Dues and monthly payments to the union are current, but there is an underfunding of the Trust fund due to industry consolidation. This shortfall is allocated to the employers of the remaining participants, placing significant financial stress on Debtor.

9.     All of Debtor's employees are paid on a weekly basis, except for senior management, who are paid monthly. Key management personnel include myself, Wendy Seelig,

3

Secretary and Gary Lavery, Vice President. The seasoned management team is crucial to Debtor's success and ability to maintain its business and customer relationships, which were developed over a significant period. Should any of these key individuals leave Debtor prior to a disposition of the business and the transition of operations to a new experienced management team, management believes that there would be a material adverse impact on Debtor.

### B. Events Leading Up to the Chapter 11 Filing

10.    A number of factors contributed to Debtor's decision to commence this Chapter 11 Case. Debtor has experienced a decline in revenue over the past two to three years. In 2014, Debtor's gross revenue was $43,689,235.00, while in 2016 gross revenue fell to $43,176,177.00.[1]

11.    There is a high degree of competition in the industry; Debtor competes with numerous suppliers and manufacturers, many of which have significantly greater financial and operational resources than Debtor. In 2017, Debtor lost several important clients, including Blue Apron, Hilton Hotels and Starwood Hotels, to competitors with greater resources. This contributed to Debtor's decline in revenue. To stem this loss of important clients, Debtor believes it is critical to move forward with a sale of its business to a buyer with greater financial and operational resources, and to do so as quickly as possible to avoid uncertainty in the market and preserve its valuable supplier and customer relationships. It is crucial to note that Debtor's customers do not have long-term supply contracts with Debtor, but rather manage all their contractual relationships for the supply of goods through a series of individual purchase orders, such that Debtor's customers would easily be able to re-source the products they buy from Debtor.

---

[1] Projected gross revenue for 2017 were approximately $51,500,000.00, in large part due to a contract entered into by Debtor and Queensboro Farm Products, Inc.. While sales appear to have increased for the year 2017, the Debtor's EBITDA has been steadily decreasing for the past three (3) years.

12.    In addition, and perhaps more significantly, over the course of the last several years, the New York State Insurance Fund ("NYSIF") substantially raised premium prices with respect to Debtor's workers' compensation insurance policy, placing an impossible financial burden on Debtor.    Specifically, in addition to increasing the annual premium by over $100,000.00, from April 2013 to March 2017, NYSIF increased Debtor's modification surcharge from $126,203.06 to $378,895.45 and increased the NYSIF surcharge from $134,616.40 to $659,909.58.    Moreover, over the last four years, Debtor's assessment charge rose from $31,255.18 to $175,233.37.    As a result, Debtor's total annual premium escalated from $505,851.97 to $1,533,881.00.  The surge was primarily a result of an increase in payouts made by NYSIF in 2013 due to several injured employees.

13.    Debtor has exhausted all possible remedies to reduce its inflated annual premium without success, including appealing the increases, meeting with NYSIF representatives and agents and engaging a lobbyist. Because the total annual worker's compensation insurance premium is now simply financially unmanageable, Debtor has struggled to fully satisfy its premium obligations.

14.    Furthermore, Debtor incurred substantial indebtedness regarding an audit for workers' compensation insurance premiums with respect to Debtor's policy with the NYSIF for the period covering April 1, 2016 through April 1, 2017.  In connection with the audit, on June 21, 2017, Debtor entered into a Settlement Installment Plan ("Plan") with the Commissioners of NYSIF for payment of an outstanding premium balance in the amount of $303,916.75.    In accordance with the Plan, Debtor made an initial payment to NYSIF in the amount of $14,116.75.  Pursuant to the Plan, Debtor agreed to tender twenty-three additional monthly payments in the amount of $12,600.00, beginning on August 1, 2017.  Debtor made five (5)

installment payments for the months of August, September, October, November and December 2017. This indebtedness and the monthly payments due under the Plan have put a significant financial strain on Debtor's ability to conduct its business.

15.    In addition to monthly payments under the Plan described above, Debtor makes monthly payments to the New York State Workers' Compensation Board pursuant to a settlement agreement, dated October 3, 2013, whereby Debtor acknowledged it owed $620,683.00, plus interest, to the Wholesale Retail Workers' Compensation Trust ("Trust"), which constituted Debtor's *pro rata* allocation of the cumulative deficit of the Trust.[2] Debtor is current on these payment obligations as of the Petition Date. These monthly payments to the Trust, however, augment Debtor's financial stress. Debtor will greatly benefit from the breathing spell afforded by the automatic stay and the other protections available under the Bankruptcy Code as it seeks to maximize the value of its assets.

16.    As a result of its financial distress, in July 2016, Debtor began conversations with The Chef's Warehouse, Inc. ("CW") about a potential sale of Debtor's assets. CW is a well-known specialty food distributor that has been involved in the industry for over 30 years. CW is wholly unrelated to Debtor and is an independent third party. CW approached Debtor after becoming aware, through its involvement in the industry, of Debtor's potential interest in selling its business.

17.    Debtor engaged in good faith and arm's length negotiations with CW regarding the terms of a potential sale of certain of its assets to CW, which led to the execution of a non-binding preliminary Letter of Intent (the "LOI") to sell certain of Debtor's assets, free and clear

---

[2] Pursuant to the settlement agreement, Debtor agreed to tender $4,095.00 per month to the New York State Workers' Compensation Board for fifteen years.

of all liens, claims, and encumbrances ("Assets") to CW for a purchase price of $2,125,000.00, which was signed on August 3, 2017.

18.     The LOI specifies that CW (or an affiliate) would purchase the Assets through a private asset sale consummated through sections 363(b) and (f) of the Bankruptcy Code, and that CW is willing to assume liability for certain trade obligations of Debtor, but was unwilling to assume certain significant liabilities, including, but not limited to, the Debtor's workers' compensation liabilities and the Debtor's liabilities relating to the underfunding of the multi-employer pension plan in which Debtor participated, and other liabilities not expressly designated for assumption.  It is my understanding that the exclusion of such liabilities is a critical component of CW's offer and that CW would not pursue a sale if the assets were not sold free and clear of such liabilities.  The full extent of the liabilities being assumed and the liabilities being excluded in connection with the proposed sale to CW (through its affiliate, Dairyland USA Corporation, referred to herein as the "Buyer") are set forth in detail in the Asset Purchase Agreement entered into by the parties (an executed copy of which is attached to the Sale Motion, as defined below).

19.     Pursuant to the LOI, I am to be engaged in an advisory capacity for a period of three (3) months to ensure the smooth transition of Debtor's customers and routes to the Buyer. Gary Lavery will also be engaged in an advisory capacity for three (3) months, and Wendy Seelig will become an employee of CW for a six (6) month period.

20.     In order to ensure that the transaction with CW represents the highest and best offer available for the Assets and to ensure that the value of the Assets was being maximized, on or about August 7, 2017, Debtor retained Traxi LLC ("Traxi") to conduct a formal marketing process and to identify all parties interested in potentially purchasing Debtor's assets as a going

concern and to analyze sale transaction alternatives. Debtor retained other professionals, including legal counsel, to assist in this effort as well.

21. Traxi actively marketed Debtor for more than 90 days commencing on or about September 20, 2017. Traxi prepared a teaser and a Confidential Information Memorandum ("CIM") to facilitate the marketing process. The CIM contained adequate information to enable prospective purchasers to assess the opportunity and express preliminary interest in exploring a transaction with Debtor. The teaser was provided to 97 parties identified by Traxi as potential purchasers. Twenty-one (21) interested parties signed a confidentially agreement and nineteen (19) parties were then provided with the CIM. Of those parties who signed CIMs, three (3) were provided access to a private virtual data room maintained by Traxi to facilitate their due diligence. While no binding offers were received, CW submitted a letter of intent.

22. I believe that the sale process undertaken prepetition was a fulsome process that was professionally conducted by Traxi, was designed to appropriately market test the Assets and was reasonable under the circumstances. Parties interested in potentially purchasing the Assets were afforded a reasonable and fair opportunity to bid on them. No other viable alternatives to the Buyer were identified.

23. As indicated above, it is imperative to move as expeditiously as possible with the sale of the Assets to preserve business relationships and maximize value, especially given the competition in the industry and the ability of the Debtor's customers to easily re-source their purchases from other suppliers. For these reasons, the offer from the Buyer expressly requires the sale to proceed expeditiously by private sale, but subject to full notice required under the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure. Debtor has no assurance from the Buyer that it will remain interested in acquiring the Assets if the sale process is delayed, and

the Buyer has the right to terminate the Asset Purchase Agreement if, among other things, the sale is not approved within the timeline set forth therein.

24.    I believe that no further marketing of the Assets is necessary and that the Buyer's offer represents the highest and best alternative available. Any further marketing efforts and the attendant delay will only increase the risk of disruption of relationships with customers and suppliers and place the value of Debtor's Assets in jeopardy. For these reasons, I believe that the proposed sale to the Buyer is in the best interest of Debtor, will benefit its estate and creditors and will maximize value.

25.    With available funds all but exhausted, Debtor now finds itself in need of the protections afforded by the Bankruptcy Code in order to promptly consummate the private sale transaction with the Buyer.

26.    To allow for Debtor's bankruptcy case to be funded and the sale of the Assets to be completed, Debtor requested that the Buyer provide a debtor-in-possession financing facility ("DIP Facility") in an amount up to $1,000,000.00 to cover any cash shortfall that might occur during this Chapter 11 Case. The Buyer has agreed to provide the financing facility on the terms set forth in the credit agreement ("Credit Agreement") filed as an exhibit to Debtor's motion to approve the DIP Facility ("DIP Motion") filed concurrently herewith. Among other things, the terms provide that the Buyer will fund draws under the DIP Facility up to a maximum amount of $1,000,000.00 to cover expenses set forth in an agreed budget, but only to the extent necessary to cover an actual cash shortfall and only upon the other terms and conditions set forth in the Credit Agreement. To secure all obligations owing under the DIP Facility, Debtor is granting the Buyer a superpriority claim and senior liens on all property of Debtor's estate, in each case subject to an agreed carve-out and as otherwise set forth in detail in the Credit Agreement and the proposed

order submitted with respect to the DIP Motion. The Buyer will have the unqualified right to credit all amounts owing under the DIP Facility towards the purchase price for the Assets.

27.     Debtor has been unable to locate a source (see para. 22, *infra*.), other than the Buyer, to purchase its assets. With available funds all but exhausted, Debtor now finds itself in need of the protections afforded by the Bankruptcy Code.

### C. Reorganization of Debtor

28.     Following the commencement of this case, Debtor will pursue the private sale of the Assets to the Buyer pursuant to section 363 of the Bankruptcy Code.

## II.    SUMMARY OF FIRST DAY MOTIONS[3]

29.     Concurrent with the filing of the Petition, Debtor intends to file the Sale Motion and the First Day Motions listed below, which I believe are necessary to enable Debtor's business to operate with a minimum of disruption and loss of productivity. Debtor intends to seek entry of orders approving each of the First Day Motions as soon as possible in accordance with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), and the Local Bankruptcy Rules.

i.     Sale Motion

30.     By this Motion, Debtor requests entry of an order pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 (i) approving the private sale of the Assets to the Buyer on the terms set forth in the Asset Purchase Agreement free and clear of liens, claims and encumbrances, (ii) authorizing the assumption and assignment of certain unexpired leases and executory contracts in connection with that sale, and (iii) granting related relief.

---

[3] All capitalized terms not defined in the following summary shall have the meanings ascribed to them in the motions discussed herein.

31.    The Sale Motion sets forth the need for a private asset sale to the Buyer, rather than by auction, including the fact that Debtor was recently valued at $0.00[4] and there are no other interested purchasers despite significant marketing efforts.  As described above, the Assets were actively marketed for more than ninety (90) days, during which ninety-seven (97) teasers were sent out and twenty-one (21) persons signed nondisclosure agreements.  Of those persons who signed nondisclosure agreements, only three (3) proceeded to access the data room that was set up to provide more detailed information on the Company, and only the Buyer has made an offer to purchase the Company.  Based upon the extent of the marketing efforts, I believe it is unlikely that Debtor will receive a better offer and it is prudent to proceed with the proposed private sale to the Buyer.

32.    I have reviewed the Sale Motion and the facts stated therein are accurate to the best of my knowledge, information and belief. I further believe that the relief requested in the Sale Motion is in the best interest of Debtor's estate, its creditors, and all other parties in interest. Accordingly, on behalf of Debtor, I respectfully submit that the Sale Motion should be granted.

ii. DIP Financing Motion

33.    Debtor anticipates its business operations will not generate sufficient cash revenue to fund all postpetition operations and administrative expenses while it seeks approval of the private sale to the Buyer.  As such, Debtor has requested the Buyer to provide the DIP Facility in an amount up to $1,000,000.00 to cover any cash shortfall that might occur during this Chapter 11 Case.

34.    The Buyer agreed to provide the DIP Facility on the terms set forth in the Credit Agreement filed as an exhibit to the DIP Motion filed concurrently herewith.  Among other

---

[4] The valuation of the Fair Market Value of Debtor of a 100% interest in G.A.F. Seelig, Inc. as of February 28, 2017 on a control and marketable basis regarding a liquidation scenario, was provided by Jennings Business Valuation, an independent appraiser, at Debtor's request.

things, the terms provide the Buyer will fund draws under the facility up to a maximum amount of $1,000,000.00 to cover expenses set forth in an agreed budget, but only to the extent necessary to cover an actual cash shortfall and only upon the other terms and conditions set forth in the Credit Agreement.  To secure all obligations owing under the DIP Facility, Debtor is granting the Buyer a superpriority claim and senior liens on all property of Debtor's estate, in each case subject to an agreed carve-out and as otherwise set forth in detail in the Credit Agreement and the proposed order submitted with respect to the DIP Motion.  The Buyer will have the unqualified right to credit all amounts owing under the DIP Facility towards the purchase price for the Assets.

35.    I believe that the relief requested in the DIP Motion is necessary relief that will benefit Debtor's estate and facilitate the administration of this Chapter 11 Case and Debtor's ability to maximize the value of the Assets by pursuing the private sale of certain of its assets to the Buyer.

ii.    Cash Management Motion

36.    The guidelines established by the Office of the United States Trustee for the Eastern District of New York ("U.S. Trustee") require debtors in possession to take certain actions regarding pre-petition bank accounts, including, among others, closing all existing bank accounts, opening of new accounts and the immediate printing of new checks with a "Debtor in Possession" designation on them.

37.    By this motion ("Cash Management Motion"), Debtor seeks entry of interim and final orders: (i) approving the continued use of its existing bank accounts; and (ii) authorizing the continued use of existing business forms.

38.    Debtor manages its cash receipts, transfers, and disbursements – and records such collections, transfers and disbursements – through the Continuing Bank Accounts. Debtor utilizes a number of methods for disbursing and receiving funds, including: (a) debit; (b) wire transfer; and (c) written check. Debtor has collected receivables and maintained operating accounts through the Continuing Bank Accounts for an extended period of time. Debtor believes that any confusion or disruption in the continuity of these pre-existing procedures would severely hamper Debtor's ability to operate its business and marshal its assets in the most efficient manner available. This type of disruption would create adverse economic and operational consequences that would negatively affect Debtor's ability to maximize value for its creditors.

39.    The Continuing Bank Accounts are maintained at Wells Fargo, NA, and JPMorgan Chase Bank, NA, which are both financial institutions insured by the Federal Deposit Insurance Corporation ("FDIC").

40.    I have reviewed the Cash Management Motion and the facts stated therein are accurate to the best of my knowledge, information and belief. I further believe that the relief requested in the Cash Management Motion is in the best interest of Debtor's estate, its creditors, and all other parties in interest, and will enable Debtor to continue to operate its business in Chapter 11 without disruption. Accordingly, on behalf of Debtor, I respectfully submit that the Cash Management Motion should be granted.

iii.    Employee Wage Motion

41.    In the Employee Wage Motion, Debtor seeks entry of an order: (a) authorizing, but not requiring, Debtor to pay prepetition wages and benefits along with certain associated costs and taxes; (b) authorizing and directing banks to honor checks with respect thereto; and (c) granting related relief.

42.    If the requested relief is not granted, Debtor's relationship with its employees would be adversely impacted and there could well be irreparable harm to the employee morale, dedication, confidence, and cooperation. Debtor's business hinges on its relationship with its customers, and the ability to provide superior services is vital. The employees' support for Debtor's efforts is critical to the success of this Chapter 11 Case. At this early stage, Debtor simply cannot risk the substantial damage to its business that would result from any decline in its employees' morale attributable to Debtor's failure to pay wages, salaries, benefits, and other similar items.

43.    I believe that the relief requested in the Employee Wage Motion is in the best interests of Debtor's estate, its creditors, and all other parties in interest and constitutes a critical element in achieving a successful and smooth transition to Chapter 11. Accordingly, on behalf of Debtor, I respectfully submit that the Employee Wage Motion should be approved.

iv.    Information Required by Local Bankruptcy Rule 1007-4

44.    Local Bankruptcy Rule 1007-4 requires certain information related to Debtor, which is set forth below.

45.    To Debtor's knowledge, no pre-petition committee of creditors has been organized.

46.    In accordance with Local Bankruptcy Rule 1007-4(a)(v), Schedule 1 hereto is a list of the names, addresses, and where available, telephone numbers of the creditors holding the twenty (20) largest unsecured claims (excluding insiders) against Debtor. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the

reservations of rights stated on Schedule 1 regarding, among other things, the actual validity of any such claims.

47.    In accordance with Local Bankruptcy Rule 1007-4(a)(vi), Schedule 2 hereto is a list of the names, addresses, and where available, telephone numbers of creditors holding the five (5) largest secured claims against Debtor. Such list includes the amount of the claim, the nature of the claim and, if appropriate, an indication of whether such claim is contingent, unliquidated, disputed, or partially secured, subject, however, to the reservations of rights stated on Schedule 2 regarding, among other things, the actual validity of any such claim.

48.    In accordance with Local Bankruptcy Rule 1007-4(a)(vii), Schedule 3 hereto provides a summary of Debtor's assets and liabilities.

49.    In accordance with Local Bankruptcy Rule 1007-4(a)(viii), there are no securities of Debtor that are publicly held.

50.    In accordance with Local Bankruptcy Rule 1007-4(a)(ix), as of the Petition Date, none of Debtor's property will be in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity.

51.    In accordance with Local Bankruptcy Rule 1007-4(a)(x) Schedule 4 hereto is a list of all of the leased premises from which Debtor operates its business. Debtor does not own any real property or operate from any other premises under other arrangement.

52.    In accordance with Local Bankruptcy Rule 1007-4(a)(xi), Debtor's substantial assets are located in Queens, New York. Its books and records are located in Queens, New York and it does not hold any assets outside the territorial limits of the United States.

53.     In accordance with Local Bankruptcy Rule 1007-4(a)(xii), Debtor is not involved in any action or proceeding threatened or pending, where a judgment against Debtor or seizure of its property is imminent.

54.     In accordance with Local Bankruptcy Rule 1007-4(a)(xiii), Schedule 5 hereto is a list of the names of the individuals who comprise Debtor's existing senior management, their tenure with Debtor, and a brief summary of their relevant responsibilities and experience.

55.     Debtor intends to continue to operate as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

56.     In accordance with Local Bankruptcy Rule 1007-4(a)(xiv) and (xv), Schedule 6 hereto is the estimated amounts of: (i) payroll due to employees of Debtor (exclusive of officers, directors, stockholders and partners) for the 30-day period following the filing of the Chapter 11 petition; and (ii) the amount paid and proposed to be paid to officers and directors.

57.     In accordance with Local Bankruptcy Rule 1007-4(a)(xvi), Schedule 7 hereto contains the estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but which remain unpaid, other than professional fees, for the 30-day period following the commencement of this Chapter 11 Case.

Dated: Queens, New York
       December 29, 2017

By: _____
    Rodney P. Seelig
    President

Sworn to before me this
29 day of December, 2017

_____
Notary Public

RICHARD E. WELTMAN
Notary Public, State of New York
No. 02WE4688426
Qualified in New York County
Commission Expires March 30, 20__

C:\Users\nhazan...
4)_10856...

16

## SCHEDULE 1

## <u>LARGEST UNSECURED CLAIMS HOLDERS</u>

1.      Pursuant to Local Rule 1007-4(a)(v), the following provides information with respect to the holders of unsecured claims against Debtor.

2.      The information contained herein shall not constitute an admission of liability by, nor is it binding on, Debtor. Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistences between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts as of October 27, 2017.

3.      For a list of Debtor's creditors holding the largest twenty (20) unsecured claims please see attached.

Fill in this information to identify the case:

| | |
|---|---|
| Debtor name | **G.A.F. Seelig, Inc.** |
| United States Bankruptcy Court for the: | **EASTERN DISTRICT OF NEW YORK, BROOKLYN DIVISION** |
| Case number (if known): | _____ |

☐ Check if this is an

amended filing

## Official Form 204

### Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders

12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 20 largest unsecured claims.

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| **Barry Callebaut USA, LLC** 1500 Suckle Hwy Pennsauken, NJ 08110-1423 | **Jeff Kulhawy** Jeff_kulhawy@barry-callebaut.com (856) 486-9921 | Trade debt | | | | $50,531.14 |
| **Boiron Freres** Parc d'activities du 45 parrall 1 Rue Brillat Savarin | **Robert Miller** Rmiller@boironfreres.com (917) 747-5114 | Trade debt | | | | $81,000.00 |
| **Bridor USA** 2260 Industrial Way Vineland, NJ 08360-1517 | **James Makowski** james.makowski@bridor.com (570) 675-2115 | Trade debt | | | | $94,042.48 |
| **Byrne Dairy** 240 Oneida St Syracuse, NY 13202-3317 | **Donna Serio** donna.serio@byrnedairy.com (315) 401-1766 | Trade debt | | | | $83,011.12 |
| **Clover Farms Dairy Co.** 3300 Pottsville Pike P.O. Box 14627 Reading, PA 19612 | **Betty Sweitzer** bettys@cloverfarms.com (800) 323-0123 | Trade debt | | $1,597,159.64 | $1,000,000.00 | $597,159.64 |
| **Daniele Inc.** PO Box 970003 Boston, MA 02297-0003 | **Andrea Buchanah** abuchanan@danielefoods.com (215) 817-7966 | Trade debt | | | | $100,985.16 |
| **Dot Foods, Inc.** 4529 Solutions Ctr Chicago, IL 60677-4005 | **Chris Babb** CBabb@DOTFOODS.com (866) 325-2655 | Trade debt | | | | $63,053.90 |

Software Copyright (c) 1996-2017 CIN Group - www.cincompass.com

Debtor    G.A.F. Seelig, Inc.                                    Case number *(if known)*    _____
          Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government) | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| Esbenshade Farms 220 Eby Chiques Rd Mount Joy, PA 17552-8800 | Leon Martin  llmartin@esbenshadefarmmill.com (717) 653-8061 | Trade debt | | | | $72,429.81 |
| Garelick Farms of Lynn 626 Lynnway Lynn, MA 01905-3030 | Jim Shea  jim_shea@deanfoods.com (508) 553-5355x280 | Trade debt | | | | $131,698.77 |
| HP Hood LLC PO Box 4060 Boston, MA 02211-4060 | Chuck Arnone  chuck.arnone@hphood.com (800) 343-6592 | Trade debt | | | | $35,934.34 |
| Lecoq Cuisine Corp. 35 Union Ave Bridgeport, CT 06607-2335 | Eric Lecoq  erin@lecoqcuisine.com (203) 334-1010x2101 | Trade debt | | | | $37,769.20 |
| Local 584 Pension Fund 265 W 14th St Ste 205 New York, NY 10011-7188 | Mike Spinelli  mspin553@verizon.net (212) 929-6828 | Pension | Disputed | | | $37,066.13 |
| Local 584 Welfare Fund 265 W 14th St Ste 205 New York, NY 10011-7188 | Mike Spinelli  mspin553@verizon.net (212) 929-6828 | Pension | | | | $40,365.88 |
| Midland Farms, Inc. 375 Broadway Menands, NY 12204-2708 | Rick Sedotto  rsedotto@midlandfarms.com (518) 436-7038 | Trade debt | | | | $130,494.83 |
| Narragansett Creamery 33 Dearborn St Providence, RI 02909-4101 | Mark Federico  mark@richeeses.com (401) 272-4979 | Trade debt | | | | $59,280.00 |
| New York State Insurance Fund PO Box 5328 New York, NY 10087-5328 | | Insurance | Disputed | | | $716,579.65 |

Debtor  **G.A.F. Seelig, Inc.**                                          Case number *(if known)* _____
          Name

| Name of creditor and complete mailing address, including zip code | Name, telephone number and email address of creditor contact | Nature of claim (for example, trade debts, bank loans, professional services, and government | Indicate if claim is contingent, unliquidated, or disputed | Amount of claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|
| | | | | Total claim, if partially **secured** | Deduction for value of collateral or setoff | Unsecured claim |
| **O-AT-KA Milk Products Coop Inc.** PO Box 8000 **Buffalo, NY 14267-0002** | **Craig Alexander** calexander@oatka milk.com (585) 815-4212 | **Trade debt** | | | | $98,562.57 |
| **Sodexo Marriot Services** PO Box 7247-8673 **Philadelphia, PA 19170** | **Sue Fenimore** (484) 201-2466 | **Trade debt** | | | | $33,834.34 |
| **Upstate Farms Cooperative, Inc.** PO Box 650 **Buffalo, NY 14225-0650** | **Jay Rentschler** JRentschler@upst atefarms.com (716) 892-3156 | **Trade debt** | | | | $33,546.24 |
| Valrhona, Inc. 222 Water St **Brooklyn, NY 11201-1125** | **Alison Watkins** alison.watkins@val rhona.com (718) 614-8831 | **Trade debt** | | | | $43,258.14 |

Software Copyright (c) 1996-2017 CIN Group - www.cincompass.com

## SCHEDULE 2

### LARGEST SECURED CLAIMS HOLDERS

1.      Pursuant to Local Rule 1007-4(a)(vi), the following provides information with respect to the holders of largest secured claims against Debtor.

2.      The information contained herein shall not constitute an admission of liability by, nor is it binding on, Debtor. Debtor reserves all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt. In the event of any inconsistences between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control. The schedule estimates outstanding claim amounts as of October 31, 2017.

3.      Following is the list of Debtor's creditors holding the five (5) largest secured claims.

| Name of Creditor | Name, Telephone number and complete mailing address, including zip code, of employee, agent or department of creditor familiar with claim who may be contacted | Nature of claim (trade debt, bank loan, government contract, etc.) | Indicate if claim is contingent, unliquidated, disputed or subject to setoff | Amount of claim (if partially or fully secured also state value of security) |
|---|---|---|---|---|
| Clover Farm Dairy Co. | 3300 Pottsville Pike Reading, PA 19612 | Trade Debt | | $1,597,159.64 secured by $1,000,000.00 letter of credit. |

## SCHEDULE 3

## <u>SUMMARY OF DEBTOR'S ASSETS AND LIABILITIES</u>

Pursuant to Local Rule 1007-4(a)(vii), the following financial data (unaudited and subject to change) is the latest available information and reflects Debtor's financial condition, as of October 31, 2017. The following financial date shall not constitute an admission of liability by Debtor. Debtor reserves all rights to assert that any debt or claim included herein is a contingent, unliquidated or disputed claim or debt or challenge the priority, nature, amount or status of any claim or debt.

Total Assets (Book Value):          $6,006,254.54

Total Liabilities:                       $4,305,923.78[5]

---

[5] As of October 27, 2017.

## SCHEDULE 4

Pursuant to Local Rule 1007-4(a)(x), the following chart lists the premises owned, leased, or held under other arrangements from which Debtor operates it businesses:

| Property Address | Type of Interest |
|---|---|
| 59-05 52nd Avenue Woodside, New York 11377 | Lease |

**SCHEDULE 5**

Pursuant to Local Rule 1007-4(a)(xiii), the following is a list of the names of Debtor's existing senior management:

| Name | Position | Experience and Tenure with Company |
|------|----------|-------------------------------------|
| Rodney Seelig | President, Chief Executive Officer and Chief Financial Officer | Mr. Seelig has 45 years of experience in running the Company. His date of hire was June 1, 1972. |
| Wendy Seelig | Secretary | Ms. Seelig has 32 years of experience with the Company. She manages the Company's accounts receivables and supervises the billing department. |
| Gary Lavery | Vice President, Chief Information Officer. | Mr. Lavery has 21 years of experience with the Company. He supervises all human resources matters and manages the administration department. He also handles the Company's compliance and reporting requirements. |

## SCHEDULE 6

### POST-COMMENCEMENT DATE PAYMENTS

Pursuant to Local Rules 1007-4(a)(xiv) and (xv), the following provides the estimated amount of weekly payroll to Debtor's employees (not including officers, directors, and stockholders) and the estimated amount to be paid to officers, stockholders, directors, and financial and business consultants retained by Debtor, for the 30-day period following the filing of the Chapter 11 petition.

Payments to Employees:                   approximately $360,000.00

Payments to Officers:                     approximately $60,000.00

## SCHEDULE 7

## POST-COMMENCEMENT DATE ESTIMATED OBLIGATIONS AND RECEIVABLES

Pursuant to Local Rule 1007-4(a)(xvi), the following provides, for the 30-day period following the filing of the Chapter 11 petition, the estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees of Debtor.

### SEE ATTACHED BUDGET

**GAF SEELIG, INC**
**WEEKLY CASH FLOW ANALYSIS - BUDGET**

CONFIDENTIAL

| CASH BUDGET | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BUDGET WEEK ENDING>> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | WK 0 to 13 |
| | 12/30/17 | 01/06/18 | 01/13/18 | 01/20/18 | 01/27/18 | 02/03/18 | 02/10/18 | 02/17/18 | 02/24/18 | 03/03/18 | 03/10/18 | 03/17/18 | 03/24/18 | TOTAL |
| **Beginning Cash Balance** | $ 380,041 | $ 329,655 | $ 81,533 | $ 295,677 | $ 530,223 | $ 406,792 | $ 18,685 | $ 6,845 | $ 38,132 | $ 28,460 | $ 47,359 | $ 38,013 | $ 48,784 | $ 500,000 |
| **Cash Receipts:** | | | | | | | | | | | | | | |
| A/R Collections | 892,000 | 984,000 | 981,000 | 917,000 | 656,100 | 677,700 | 668,000 | 617,600 | 684,800 | 679,200 | 619,500 | 626,250 | 579,000 | 11,348,150 |
| Other Cash Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Cash Receipts** | 892,000 | 984,000 | 981,000 | 917,000 | 656,100 | 677,700 | 668,000 | 617,600 | 684,800 | 679,200 | 619,500 | 626,250 | 579,000 | 11,348,150 |
| **Cash Disbursements - Operating** | | | | | | | | | | | | | | |
| Payroll Expense (incl. taxes) | 80,364 | 80,364 | 132,664 | 80,364 | 132,664 | 80,364 | 132,664 | 80,364 | 132,664 | 80,364 | 132,664 | 80,364 | 80,364 | 1,466,957 |
| Pension and Welfare | - | 98,500 | - | - | - | 98,500 | - | - | - | 98,500 | - | - | - | 295,500 |
| Comp Insurance | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 24,900 | 373,500 |
| Purchases | 536,598 | 555,471 | 544,920 | 506,328 | 558,504 | 555,456 | 506,610 | 510,188 | 473,445 | 510,930 | 506,520 | 489,353 | 499,545 | 8,294,457 |
| Freight & Shipping | 19,575 | 24,469 | 24,469 | 24,469 | 24,469 | 24,469 | 24,469 | 24,469 | 24,469 | 24,469 | 24,469 | 24,469 | 24,469 | 352,350 |
| Vendor Deposits upon Filing Chap 11 | 250,000 | 250,000 | | | | | | | | | | | | 500,000 |
| General Insurance | 2,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 36,000 |
| Repairs & Maintenance | 430 | 538 | 538 | 538 | 538 | 538 | 538 | 538 | 538 | 538 | 538 | 538 | 538 | 7,740 |
| Sales Rebates | 8,364 | 11,326 | 11,326 | 11,326 | 11,326 | 11,326 | 11,326 | 11,326 | 11,326 | 11,326 | 11,326 | 11,326 | 11,326 | 161,009 |
| Auto Expense | 280 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 5,040 |
| Bank & Other Fees | - | 1,300 | - | - | - | - | 1,300 | - | - | - | 1,300 | - | - | 3,900 |
| Office Expense | 6,110 | 6,405 | 6,405 | 6,405 | 6,405 | 6,405 | 6,405 | 6,405 | 6,405 | 6,405 | 6,405 | 6,405 | 6,405 | 95,190 |
| Rent | | 44,500 | | | | 44,500 | | | | 44,500 | | | | 133,500 |
| Insurance | 2,405 | 2,325 | 2,325 | 2,325 | 2,325 | 2,325 | 2,325 | 2,325 | 2,325 | 2,325 | 2,325 | 2,325 | 2,325 | 38,908 |
| Utilities | - | 28,100 | - | 10,000 | - | 28,100 | - | 10,000 | - | 28,100 | - | 10,000 | 10,000 | 154,300 |
| Telephone | - | - | 2,600 | - | 2,600 | - | 2,600 | - | 2,600 | - | 2,600 | - | 2,600 | 15,600 |
| Professional Fees | 1,760 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 2,200 | 31,680 |
| Miscellaneous Expense | 9,600 | 10,750 | 10,750 | 10,750 | 10,750 | 10,750 | 10,750 | 10,750 | 10,750 | 10,750 | 10,750 | 10,750 | 10,750 | 157,800 |
| **Total Operating Disbursements** | 942,386 | 1,143,997 | 765,946 | 682,454 | 779,530 | 892,682 | 728,936 | 686,314 | 694,471 | 848,156 | 728,846 | 665,479 | 678,271 | 12,123,431 |
| **Cash Disbursements - Non-Operating:** | | | | | | | | | | | | | | |
| Interest Expense | - | - | 909 | - | - | - | 903 | - | - | 1,519 | - | - | - | 3,331 |
| Debtor's Counsel (1) | - | 25,000 | - | - | - | 60,000 | - | - | - | 40,000 | - | - | - | 125,000 |
| Debtor's Financial Advisor (1) | - | 30,000 | - | - | - | 65,000 | - | - | - | 40,000 | - | - | - | 135,000 |
| Debtor's Corp. counsel (1) | - | 12,500 | - | - | - | 37,500 | - | - | - | 20,000 | - | - | - | 70,000 |
| Debtor's Corp. accountant | - | - | - | - | - | - | - | - | - | 20,000 | - | - | - | 20,000 |
| Unsecured creditors professionals (1) | - | - | - | - | - | 40,000 | - | - | - | 20,000 | - | - | - | 60,000 |
| Real Estate Taxes | - | 20,625 | - | - | - | 20,625 | - | - | - | 20,625 | - | - | - | 61,875 |
| **Total Non-Operating Disbursements** | - | 88,125 | 909 | - | - | 223,125 | 903 | - | - | 162,144 | - | - | - | 475,206 |
| **Total Disbursements** | 942,386 | 1,232,122 | 766,855 | 682,454 | 779,530 | 1,115,807 | 729,839 | 686,314 | 694,471 | 1,010,301 | 728,846 | 665,479 | 678,271 | 12,598,638 |
| *NET CASH FLOW* | (50,386) | (248,122) | 214,145 | 234,546 | (123,430) | (438,107) | (61,839) | (68,714) | (9,671) | (331,101) | (109,346) | (39,229) | (99,271) | (1,250,488) |
| DIP Loan | - | - | - | - | - | 50,000 | 50,000 | 100,000 | - | 350,000 | 100,000 | 50,000 | 100,000 | 800,000 |
| **Ending Cash Balance** | $ 329,655 | $ 81,533 | $ 295,677 | $ 530,223 | $ 406,792 | $ 18,685 | $ 6,845 | $ 38,132 | $ 28,460 | $ 47,359 | $ 38,013 | $ 48,784 | $ 49,512 | $ 49,512 |

GAF Seelig - 13 Week (Extended) Cash Flow Forecast Private Sale Final v2- with DIP Loan