**Richard E. Weltman (rew@weltmosk.com)**
**Michael L. Moskowitz (mlm@weltmosk.com)**
**Debra Kramer (dk@weltmosk.com)**
**Adrienne Woods (aw@weltmosk.com)**
**WELTMAN & MOSKOWITZ, LLP**
*Proposed Attorneys for Debtor/Debtor-in-Possession*
270 Madison Avenue, Suite 1400
New York, New York 10016-0601
212.684.7800

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| G.A.F. SEELIG, INC., | ) | Case No. 17-46968-ess |
| | ) | |
| Debtor. | ) | |
| | ) | |

**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS: (1) AUTHORIZING
DEBTOR TO INCUR POSTPETITION FINANCING WITH SUPERPRIORITY OVER
ADMINISTRATIVE EXPENSE CLAIMS PURSUANT TO SECTIONS 105(a) AND
364(c) OF THE BANKRUPTCY CODE; (2) GRANTING FIRST PRIORITY DEBTOR IN
POSSESSION LIENS; (3) SCHEDULING A FINAL HEARING AND ESTABLISHING
NOTICE REQUIREMENTS PURSUANT TO BANKRUPTCY RULES 2002, 4001 AND
9014; AND (4) GRANTING RELATED RELIEF**

TO:     THE HONORABLE ELIZABETH S. STONG
        UNITED STATES BANKRUPTCY JUDGE

G.A.F. Seelig, Inc. ("Debtor"), by its proposed attorneys, Weltman & Moskowitz, LLP,

hereby files this motion ("Motion") for interim and final orders: (i) authorizing Debtor to incur

postpetition financing with superpriority over administrative expense claims pursuant to sections

105(a) and 364(c) of the United States Bankruptcy Code ( "Bankruptcy Code"); (ii) granting first

priority debtor in possession liens; (iii) scheduling a final hearing and establishing notice

requirements pursuant to Bankruptcy Rules 2002, 4001 and 9014; and (iv) granting related relief.

In support of this Motion, Debtor filed the Affidavit of Rodney P. Seelig Pursuant to

Local Bankruptcy Rule 1007-4 in Support of First Day Motions (the "Seelig Affidavit")

contemporaneously herewith, and respectfully represents as follows:

## EXIGENT NEED FOR FINANCING

1.      Debtor has historically operated its business generally through its cash revenue. Debtor does not have a prepetition lender or any significant prepetition secured debt.  As described in detail in the Seelig Affidavit, Debtor has experienced a decline in revenue over the past three years attributable, in part, to the high degree of competition in the industry (as Debtor competes with many suppliers that have significantly greater financial and operational resources) and Debtor's loss of several important clients.  Perhaps more significantly, over the course of the last several years, the New York State Insurance Fund substantially raised premium prices with respect to Debtor's workers' compensation insurance policy, placing an impossible financial burden on Debtor.  Debtor has also incurred substantial debt in relation to an audit for workers' compensation insurance premiums for policies held by Debtor.  The combination of these factors (which are discussed in further detail in the Seelig Affidavit) has imposed an extreme financial burden on Debtor that cannot be sustained.

2.      To preserve and maximize the value of its assets in the face of declining revenue, customer losses, and the high degree of competition in the industry, and in order to preserve valuable supplier and customer relationships, Debtor has determined that it is imperative that it move forward as expeditiously as possible with a sale of its business to a buyer with greater financial and operational resources.  As set forth in detail in the Seelig Affidavit, Debtor conducted an extensive prepetition sale process with the assistance of its investment banker and other professionals, and has determined that a private sale to The Chefs' Warehouse Inc. (or one

of its affiliates) ("Buyer" or "Lender") is the best alternative available for Debtor, its estate and creditors under the circumstances.[1]

3.     Buyer is requiring that the sale be consummated expeditiously to, among other things, minimize the risks of additional customer losses, uncertainty in the market as to Debtor's viability, and a decline in the value of Debtor's overall business operations.  As described in the Seelig Affidavit, an expeditious sale is critical to preserving and maximizing value given the nature of Debtor's business, the potential for continued customer loss and a decline in asset value.  This timeline will also ensure that administrative expenses are managed judiciously given the size of this case.

4.     Debtor anticipates that its business operations will not generate sufficient cash revenue to fund all postpetition operations and administrative expenses while it seeks approval of the private sale to Buyer.  Thus, Debtor has requested that Buyer provide postpetition financing in an amount up to $1,000,000.00 to cover any cash shortfall that might occur during this case, and Buyer has agreed to provide that financing ("DIP Facility") on the terms set forth in the Credit Agreement attached hereto as **Exhibit A** ("Credit Agreement")[2] in accordance with an agreed budget ("Budget"), a copy of which is attached hereto as **Exhibit B**.  Draws under the DIP Facility will only be permitted to the extent that an actual cash shortfall exists.   It is Debtor's view that Lender provided the best offer for its debtor in possession needs.

5.     Debtor requires access to the DIP Facility in order to ensure that it will be able to cover operating expenses in the event of a cash shortfall while Debtor pursues the private sale of certain of its assets to Buyer.  In order to preserve value and maintain important supplier and

---

[1] A motion to approve a private sale of certain of Debtor's assets to Buyer ("Sale Motion") was filed concurrently herewith. Buyer under the Asset Purchase Agreement is Dairyland USA Corporation, an affiliate of The Chefs' Warehouse Inc.  A copy of the Asset Purchase Agreement is attached as an exhibit to the Sale Motion.

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement.

customer relationships pending the sale, Debtor's operations require sufficient levels of working capital to fund and support ordinary business expenditures, including payroll, expenses for inventory, utilities, taxes and other necessary overhead costs. Additionally, Debtor requires capital to fund the costs of this bankruptcy case, which ultimately will result in a better outcome for its unsecured creditors.

6.    As such, there is an exigent need for Debtor to have the ability to make draws under the DIP Facility in the event of a cash shortfall prior to the closing of the private sale to Buyer. Without the DIP Facility, Debtor will not be able to, *inter alia,* continue to fulfill pre-existing and new orders, pay payroll, and meet other postpetition obligations. Debtor's failure to meet these obligations will result in immediate irreparable harm to Debtor's creditors and estate, as failure to continue operations will result in devaluation of the business and, more importantly, a loss of Debtor's supplier and customer relationships that drive the value of the business. Further, Debtor will be unable to proceed with its private sale to Buyer. Approval of the DIP Facility is therefore critical to avoid immediate and irreparable harm to the estate, and to support Debtor's efforts to maximize the estate's value for the benefit of all creditors and parties-in-interest.

## SUMMARY OF RELIEF REQUESTED

7.    Debtor seeks entry of an interim order, substantially in the form attached hereto as **Exhibit C** ("Interim Order"), and following a final hearing, the entry of a final order, substantially in a form to be submitted by the parties in advance of the final hearing ("Final Order" and together with the Interim Order, "Borrowing Orders"), authorizing Debtor and Lender to enter into the DIP Facility on the terms set forth in the Credit Agreement and granting Lender senior liens and security interests and superpriority claims, as follows:

a)      pursuant to sections 364(c), 503(b) and 507 of the Bankruptcy Code and Bankruptcy Rule 4001(c), authorizing, on an interim basis, Debtor to enter into a senior secured, superpriority postpetition credit facility in the form of the DIP Facility, and to make draws thereunder as necessary to cover actual cash shortfalls in an amount up to $1 million ("DIP Loan") in accordance with the Budget and the terms of the Credit Agreement;

b)      pursuant to Section 364(c)(1) of the Bankruptcy Code, granting Lender an allowed superpriority administrative expense claim to secure all obligations of Debtor under the DIP Facility, having priority over all other administrative expenses incurred in this bankruptcy case, including without limitation, all professional fees incurred by estate professionals and all other administrative claims that may be incurred pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 thereof, but subject to the Carve-Out;

c)      pursuant to Section 364(c)(2) of the Bankruptcy Code, granting Lender a perfected first priority Lien to secure all obligations of Debtor under the DIP Facility, on all property of Debtor that was unencumbered by any Lien as of the Petition Date or that was encumbered by an invalid, unperfected, or avoidable Lien as of the Petition Date;

d)      pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority priming Lien upon all property of Debtor that was subject to a valid, perfected and unavoidable Lien as of the Petition Date;

e)      approving the terms and conditions of the Credit Agreement and authorizing Debtor to execute and deliver, from time to time, all such documents, instruments, and agreements and perform other such acts as may be required, necessary or desirable in connection with the Credit Agreement including, without limitation, the execution of a promissory note and the payment of all fees, interest and charges required under the Credit Agreement;

f)      granting, pending a final hearing ("Final Hearing"), authorization for Debtor to borrow up to $100,000 ("Interim Amount") under the DIP Facility pursuant to the Interim Order in order to cover cash shortfalls projected to occur prior to the Final Hearing as set forth in the Budget;

g)      modifying the automatic stay provisions of section 362 of the Bankruptcy Code to the extent necessary to permit Lender to implement the terms and provisions of the Credit Agreement and the provisions of the Borrowing Orders;

h)      scheduling and approving the form and manner of notice of the Final Hearing to consider entry of the Final Order granting the relief sought herein on a permanent basis; and

i)      granting such further relief as is just and proper.

## JURISDICTION

8.      The Court has jurisdiction over this Motion under 28 U.S.C. §1334, which is a core proceeding within the meaning of 28 U.S.C. §157(b)(2).   Venue of these proceedings is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

9.      On December 30, 2017 ("Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Eastern District of New York.

10.      Debtor is authorized to operate its business and manage its property as debtor-in-possession pursuant to Bankruptcy Code §§ 1107(a) and 1108.   No trustee, examiner, or statutory committee of unsecured creditors has been appointed in this case.

### Debtor's Business Operations

11.      Debtor is a family-owned company engaged in the sale and distribution of fine foods and dairy products since 1871.  Debtor provides customers throughout the Tri-State area with all types of milk products, yogurts, juices, water, imported and domestic cheeses, purees, raviolis and pastas, oil and vinegars, chocolates and other food service items.

12.      Information pertaining to the Applicant's business, capital structure and the circumstances leading to the commencement of the Chapter 11 case is set forth in the Affidavit of Rodney P. Seelig Pursuant to Local Bankruptcy Rule 1007-4 in Support of First Day Motions (the "Seelig Affidavit"). The facts and statements contained in the Seelig Affidavit are incorporated herein by reference.

6

**Prepetition Secured Debt**

13.     Historically, Debtor has operated its business through cash revenue.  Debtor does not have a prepetition lender or any significant prepetition secured debt, except for capital lease obligations and equipment finance liens.

**Necessity for the DIP Financing**

14.     Debtor's efforts to maximize value for creditors in this Chapter 11 case hinge on access to adequate financing to maintain postpetition operations and to fund administrative expenses of this case.  Enabling Debtor to accomplish its Chapter 11 bankruptcy goals will allow Debtor to maximize the value of its assets for the benefit of creditors.  Without DIP financing, Debtor cannot operate and fund administrative expenses.  It is axiomatic that businesses such as Debtor's require sufficient liquidity to satisfy their ongoing cash requirements to purchase inventory and to pay employees, the landlord, utilities and myriad other ordinary course day-to-day expenditures as well as the administrative expenses of this case as Debtor gears up for an expedited private sale under section 363 of the Bankruptcy Code.  Absent access to postpetition financing, Debtor's current assets and cash provide insufficient liquidity to satisfy its ongoing obligations.

15.     Debtor's vendors and other creditors are looking to the immediate approval of the DIP Facility for assurance that operations will continue, and the bills will be paid, on a continuous and timely basis.  Similarly, Debtor's employees will view the DIP Facility as an assurance of timely funding of Debtor's payroll account and that other employee-related obligations will be met.  The confidence of the ongoing cooperation of suppliers, vendors, and employees is critical if Debtor is to continue to operate in an orderly manner.

16.     Without immediate access to credit pursuant to the proposed DIP Facility, there would be a mass exodus of employees and vendors and suppliers may refuse to continue providing goods and services.  The resulting termination of Debtor's business would destroy the value of its operating business and significantly devalue its assets.  This likely would result in Buyer withdrawing its offer, and would undoubtedly cause immediate and irreparable harm to Debtor's estate and its creditors.  Quite simply, the urgency of Debtor's immediate need for postpetition financing cannot be overstated.  Cash is needed to allow this business to run and remain attractive to interested buyers.

**DIP Financing Alternatives**

17.     Debtor reached out to lenders and requesting term sheets for debtor in possession financing.  Few lenders are interested in making a loan of this small size.  Debtor received two (2) terms sheets, both of which offers less favorable terms and more restrictive borrowing.

18.     Debtor has determined, in the exercise of its business judgment and in consultation with its advisors, that the financing proposed by Buyer in the form of the DIP Facility is the best alternative available.  Debtor believes that the terms and conditions of the Credit Agreement are reasonable under the circumstances.  Debtor has also reviewed Lender's financial information and believes Lender has the financial wherewithal to fund fully its lending commitments under the Credit Agreement.

19.     Debtor believes that the DIP Facility offered by Lender is the best alternative available to it.  In addition, Debtor will not have to pay the usual due diligence, origination and commitment fees associated with such financing, except for Lender's legal fees.  Indeed, Debtor projects that the DIP Loan will improve its liquidity and help stabilize its operations until the private sale to Buyer is consummated, a result that would not be possible except through the

proposed DIP Loan. Debtor is certain that it would not otherwise be able to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as administrative expense, or secured solely by liens and security interests junior to those of pre-petition creditors.

## PROPOSED DEBTOR-IN-POSSESSION FINANCING

20.    A brief summary of certain of the key provisions of the DIP Loan follows below. The Court and parties-in-interest, however, are respectfully referred to the Credit Agreement for a full recitation of the terms and conditions of the DIP Loan. To the extent that the following summary conflicts in any way with the Credit Agreement, the terms of the Credit Agreement shall govern.

| | |
|---|---|
| Borrower: | G.A.F. Seelig, Inc. |
| Lender: | Dairyland USA Corporation |
| Commitment Availability: | Up to $1,000,000.00 to be used only to the extent of a cash shortfall for the purposes set forth in the agreed Budget and otherwise in accordance with the terms of the Credit Agreement. In the event the Court approves the private sale to Buyer, all obligations of Debtor on account of advances made by Lender under the DIP Facility shall be applied to the purchase price Buyer is required to pay for the assets it is acquiring and reduce the cash portion of the purchase price accordingly on a dollar for dollar basis, as provided in the Asset Purchase Agreement. |
| Priority and Liens: | To secure all borrowings and other obligations of Debtor under the DIP Facility, Lender is to be granted the following superpriority claims, and the following liens and security interests on and in the Collateral (which includes all assets of Debtor and its estate, including, without limitation, all of Debtor's right, title, and interest in any causes of action arising under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, all preference actions, other avoidance actions, and other causes of action arising under chapter 5 of the Bankruptcy Code, and any and all recoveries resulting from the same), in each case subject to the Carve-Out: |
| | a)    pursuant to Section 364(c)(1) of the Bankruptcy Code, granting Lender an allowed superpriority administrative expense |

claim to secure all obligations of Debtor under the DIP Facility, having priority over all other administrative expenses incurred in this bankruptcy case, including without limitation, all professional fees incurred by estate professionals and all other administrative claims that may be incurred pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 thereof;

b)      pursuant to Section 364(c)(2) of the Bankruptcy Code, granting Lender a perfected first priority Lien to secure all obligations of Debtor under the DIP Facility, on all property of Borrower that was unencumbered by any Lien as of the Petition Date or that was encumbered by an invalid, unperfected, or avoidable Lien as of the Petition Date; and

c)      pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority priming Lien upon all property of Borrower that was subject to a valid, perfected and unavoidable Lien as of the Petition Date.

**Carve-Out:**    There is a Carve-Out for: (a) the fees of the U.S. Trustee pursuant to 28 U.S.C. §1930; (b) in the event of a conversion of the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code, the fees and expenses incurred by a trustee and any professional retained by such trustee, in an aggregate amount not to exceed $15,000.00; and (c) any unpaid fees, costs and expenses that were accrued or incurred, following the occurrence and during the continuance of an Event of Default, by the professionals retained by Borrower or the professionals retained by any official unsecured creditors' committee appointed in the Bankruptcy Case, in each case to the extent allowed by a final order of this Court, in an aggregate amount not to exceed $100,000.00, provided that any payments actually made to such professionals by order of the Bankruptcy Court after the occurrence of an Event of Default on account of fees and expenses actually incurred after the occurrence of such Event of Default shall reduce such $100,000.00 amount on a dollar-for-dollar basis.

**Term:**    The Maturity Date shall be the earliest to occur of:

(i)      thirty five (35) days after the Petition Date;

(ii)      the date on which the Sale to Lender has been approved by a final order of the Bankruptcy Court and successfully closed by the parties to such transaction;

(iii)    the effective date of a plan of reorganization in the Bankruptcy Case that provides for the payment in full in cash of all Obligations owing by Borrower to Lender hereunder and that is otherwise in form and substance acceptable to Lender in all respects;

(iv)    the termination of the Credit Agreement and of the commitment to make Advances by Lender upon the occurrence of an Event of Default pursuant to **Section 10.1**; and

(v)    the date on which the Obligations are fully and finally paid in full.

| | |
|---|---|
| Conditions Precedent: | The availability of the total DIP Loan is conditioned upon satisfaction of usual and customary conditions precedent including, among other things, the following:<br>(i)    execution of the Credit Agreement and such other Loan Documents as Lender shall require in connection with the transactions contemplated by the Credit Agreement, including all those designated as being completed prior to the Closing Date in the Schedule of Documents;<br>(ii)    the automatic stay shall have been modified to permit the creation and perfection of Lender's Liens and the enforcement of Lender's rights and remedies in accordance with **Section 10.2**;<br>(iii)    all "First Day Orders," including the Interim Order, shall be satisfactory in form and substance to Lender in all respects;<br>(iv)    the Sale Motion shall have been filed with the Bankruptcy Court on the Petition Date, and noticed for a hearing not more than twenty-five (25) days from the Petition Date, subject to Court availability;<br>(v)    Lender shall be satisfied with the corporate structure, capital structure, debt instruments, material contracts, governing documents of Borrower, and the tax effects resulting from the commencement of the Bankruptcy Case and the Loan; and<br>(vi)    the Interim Order shall have been approved and docketed by the Bankruptcy Court in a form satisfactory to Lender. |
| Fees and Expenses: | Lender has agreed to waive customary fees. Lender's only allowed fees will be legal fees and expenses. |
| Interest Rate: | 7.5% per annum. |
| Default Interest Rate: | 9.5% per annum. |

| Representations, Warranties, Covenants, and Events of Default: | Similar to those customary in credit facilities of this nature. |

| Events of Default: | The Credit Agreement provides that upon the occurrence of an Event of Default, upon five (5) days written notice to Debtor and the U.S. Trustee, but without further order of or application to the Bankruptcy Court Lender may:<br>(i)    declare its commitment to make Advances to be terminated,<br>(ii)    declare the unpaid principal amount of the Loan, all interest accrued and unpaid thereon, and all other amounts owing or payable under the DIP Loan or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind;<br>(iii)    increase the rate of interest from the Interest Rate to the Default Rate; or<br>(iv)    take any other action or exercise any other right and remedy available to it under the Loan Documents or otherwise available at law or in equity. |

21.    Debtor believes that the terms of the Credit Agreement are reasonable and fair under the circumstances and, further, that obtaining the DIP Loan serves the best interests of Debtor, its creditors and estate.

### BASIS FOR APPROVAL OF THE DIP FACILITY AND THE GRANTING OF LIENS AND SUPERIORITY ADMINISTRATIVE CLAIMS IN CONNECTION THEREWITH

22.    Section 364 of the Bankruptcy Code authorizes this Court to allow Debtor to obtain postpetition financing from Lender in the manner proposed in the Credit Agreement.  As described above, as security for all borrowing under the DIP Loan, Debtor proposes to grant Lender a superpriority administrative claim and a lien on and security interest in all of Debtor's assets, including Avoidance Claims, senior to all claims other than the Carve-Out.  Such relief is authorized pursuant to sections 364(c)(1), (2), and (3), 503(b), and 507 of the Bankruptcy Code.

23.    The granting of superiority administrative credit is allowable under section 364(c) of this Bankruptcy Code which provides:

If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of the credit or the incurring debt –

> (1) with priority over any and all administrative expenses of the kind specified in sections 503(b) and 507(b) of this title;

> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

## BASIS FOR RELIEF

### A. The DIP Financing Should Be Approved Pursuant to Section 364(c) of the Bankruptcy Code

24.    As set forth above, Debtor's ability to maximize the value of its estate and successfully conclude a private sale to Buyer hinges upon its being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among: (a) obtaining unsecured credit in the ordinary course of business; (b) obtaining unsecured credit outside the ordinary course of business; and (c) obtaining credit with specialized priority or on a secured basis. Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  See 11 U.S.C. § 364(c).

25.    Courts have recognized that liens permitted a DIP lender under section 364 may include liens on avoidance actions and their proceeds.  *See generally, Unsecured Creditors' Comm. v. Jones Truck Lines, Inc.*, 156 B.R. 608, 610 (Bankr.  W.D. Ark. 1992) ("Post-petition liens, however, may be extended to avoidance actions . . . .").  Here, the proposed granting of liens on avoidance actions subject to a Final Order is warranted because, as a service business,

Debtor's value as a going concern far exceeds any potential liquidation value, and additional property of the estate has been required as part of the collateral package to obtain credit by Lender. *In re Ellingsen MacLean Oil Co., Inc.*, 98 B.R. 284 (Bankr. W.D. Mich. 1989) ("Property of the estate includes preferences recovered by the trustee.").

(i)      **Debtor Has Exercised Its Business Judgment in Entering into the DIP Loan**

26.      A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."); *see also In re Farmland Indus., Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (noting that approval of postpetition financing requires, *inter alia*, an exercise of "sound and reasonable business judgment."); *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment . . . [were] reasonable under the circumstances and in the best interest of [the debtor] and its creditors."

27.      Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money. *See, e.g., In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to the board room and not to this Court"). Further, one court has noted that "[m]ore exacting scrutiny [of a debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate,

and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

28.     Bankruptcy courts generally defer to a debtor in possession's business judgment regarding the need for and proposed use of funds, unless such decision is arbitrary and capricious. *See In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor). Bankruptcy courts generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." *Curlew Valley*, 14 B.R. at 513–14.

29.     Debtor has exercised sound business judgment in determining the appropriateness of the DIP Loan and has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the Credit Agreement. The Credit Agreement contain terms that are the best available under the circumstances.

30.     The funds provided by the DIP Loan are essential to enable Debtor to continue to operate during this Chapter 11 case while working to complete the anticipated private sale to Buyer. Indeed, absent immediate approval of the DIP Loan, Debtor would be unable to fund both business operations and the administrative expenses of this case. Debtor's inability to continue to operate in Chapter 11 would adversely impact its sale efforts and the value ultimately received by stakeholders, to the detriment of unsecured creditors including pension funds, employees, vendors and suppliers.

31.     Accordingly, pursuant to section 364(c) of the Bankruptcy Code, Debtor respectfully submits that it should be granted authority to enter into the Credit Agreement and obtain financing from Lender on the terms set forth therein.

(ii)     **The DIP Loan Represents the Best Financing Available**

32.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.),* 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

33.     Where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.,* 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.,* 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Garland Corp.*, 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39

(debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

34.     Debtor has determined that the terms and conditions of the DIP Loan are the best available under the circumstances and sufficiently address Debtor's immediate working capital needs.  Debtor requires immediate access to cash in order to pay employees, vendors and suppliers, as well as to honor its obligations under a collective bargaining agreement.  Further, Debtor requires cash to finance the administrative expenses of this case.  Debtor has searched for alternative funding and, while Debtor has obtained other offers of funding, none of the other lenders were willing to waive the costs and fees associated with the proposed loans and, further, each other lender proposed a higher interest rate than that provided by Lender.  Accordingly, Debtor's efforts to obtain postpetition financing satisfy the statutory requirements of section 364(c) of the Bankruptcy Code and the DIP Loan should be granted.

(iii)    **The DIP Loan is Necessary to Maintain Debtor's Ongoing Business Operations and to Achieve a Successful Sale**

35.     The DIP Loan, if approved, will provide essential working capital, allowing Debtor to maintain the value of its assets by enabling it to continue business operations while working to complete the sale in Chapter 11.  Accordingly, the DIP Loan is necessary to maximize value for Debtor's estate and inures to the benefit of creditors and all parties in interest.

(iv)    **The Terms of the DIP Documents Are Fair, Reasonable, and Adequate Under the Circumstances**

36.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms of the loan based on the relative circumstances of both the debtor and the potential lender.  *See In re Farmland Indus., Inc*., 294 B.R. 855, 886 (Bankr. W.D. Mo.

2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See* Transcript of Record at 740:4–6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions reasonable here and now.").

37.     The Credit Agreement was negotiated in good faith and at arms' length among the parties, culminating in a carefully crafted agreement designed to provide Debtor with essential working capital to maintain Debtor's business operations pending consummation of the sale of its operating assets. Indeed, when viewed in its totality, the DIP Loan reflects Debtor's exercise of prudent business judgment consistent with its fiduciary duties and supported by fair consideration. The DIP Loan does not include the usual commitment fees and is significantly less expensive than the other proposals received by Debtor.

(v)     **Section 364(e) Protections Should Apply to the DIP Loan**

38.     The terms and conditions of the DIP Loan are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the Court should find that Lender is a "good faith" lender within the meaning of Bankruptcy Code section 364(e), and are entitled to all the protections afforded by that section.

**REQUEST FOR IMMEDIATE BORROWING IS
NECCESARY TO AVOID IRREPARABLE HARM**

39.     Pursuant to Bankruptcy Rule 4001(c)(2), a minimum of 14 days' notice is required before a final hearing on this Motion may commence. However, such Rule provides

that the Court may conduct a hearing before such 14-day period expires, and may authorize the obtaining of credit, if necessary to avoid immediate and irreparable harm to the estate pending the final hearing.  Fed. R. Bankr. P. 4001(c)(2).

40.     As stated above, it is essential to the continued operation of its business that Debtor be authorized to obtain financing on an interim basis as set forth herein pending a final hearing on the Motion.  Funds are urgently needed to meet Debtor's working capital needs, pay payroll and related expenses, and preserve the value of Debtor's estate.  In the absence of immediate postpetition financing, Debtor will be unable to fund its operating expenses and the administrative expenses of this case, thwarting Debtor's attempt to maximize its value for creditors.

41.     Debtor believes the terms and conditions of the Credit Agreement represent the most favorable option for postpetition financing and for all of the foregoing reasons, are in the best interest of Debtor, its estate and its creditors.  Accordingly, Debtor respectfully requests that, pending a final herein on the Motion, the terms and provisions of the Credit Agreement be implemented and approved on an emergency interim basis, and that Debtor be authorized to obtain interim postpetition financing under the Credit Agreement in an aggregate amount not to exceed the Interim Amount on the terms and subject to the conditions set forth in the Credit Agreement.

42.     Debtor further submits that the terms and conditions of the Credit Agreement are fair and reasonable and are the result of arms' length negotiations between Debtor and Lender. Lender has even waived many of the customary fees and expenses that one would otherwise assume would be elements of a DIP loan transaction.  Accordingly, Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the DIP Loan.

43.     As is apparent from the foregoing, the interim relief requested in this Motion, pending the Final Hearing, is necessary, appropriate and fully warranted, and is essential to avoid immediate and irreparable harm to Debtor, its estate and its creditors.

## NOTICE WITH RESPECT TO THE INTERIM ORDER

44.     Debtor will provide notice by electronic transmission, hand delivery or overnight mail of this Motion pursuant to Bankruptcy Rule 4001 to: (a) the Office of the United States Trustee; (b) attorneys for Lender; (c) Debtor's equity holders; (d) Debtor's top twenty (20) unsecured creditors; and (e) any other parties requesting such notice.  Debtor respectfully submits that such notice is sufficient and requests that this Court find that no further notice of the relief requested herein is required.

## NOTICE WITH RESPECT TO FINAL ORDER

45.     Debtor proposes to serve a copy of the Interim Order and this Motion (together with exhibits) by electronic transmission, hand delivery, or overnight mail, within two (2) days after entry of the Interim Order, upon: (a) the Office of the United States Trustee; (b) attorneys for Lender; (c) Debtor's equity holders; (d) Debtor's top twenty (20) unsecured creditors; and (e) any other parties requesting such notice, and Notice of the Interim Order by first class mail on (g) all of Debtor's remaining creditors.  Debtor respectfully submits that such notice is sufficient, and requests that this Court find that no further notice of the Interim Order, the Final Hearing, the Final Order and all proceedings to be held in connection therewith is required.

46.     No previous Motion for the relief sought herein has been made to this or any other Court.

**CONCLUSION**

**WHEREFORE,** Debtor respectfully requests that the Court: (1) enter the Interim Order authorizing Debtor to obtain financing pursuant to the DIP Loan on an interim basis through the conclusion of the Final Hearing on the terms set forth herein and the Credit Agreement; (2) enter the Final Order authorizing Debtor to obtain financing under the DIP Loan on the terms set forth herein and in the Credit Agreement; and (3) grant such further relief as is just and proper.

Dated: New York, New York                     **G.A.F. SEELIG, INC.**
      January 2, 2018                     *Debtor and Debtor-in-Possession*


By its Proposed Attorneys,
WELTMAN & MOSKOWITZ, LLP


By: /s/ Michael L. Moskowitz
    **MICHAEL L. MOSKOWITZ**
270 Madison Avenue, Suite 1400
New York, New York 10016
212-684-7800