UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re:

G.A.F. SEELIG, INC.,                                            Chapter 11


                                    Debtor.                     Case No. 17-46968-ess
-------------------------------------------------------------x



**MEMORANDUM DECISION ON LOCAL 584 PENSION TRUST FUND'S
MOTION TO DISMISS THIS CHAPTER 11 BANKRUPTCY CASE**


*Appearances:*

Nazar Khodorovsky, Esq.
Office of the United States Trustee
U.S. Federal Office Building
201 Varick Street (Suite 1006)
New York, NY 10014
    *Trial Attorney for the
    United States Trustee*

Michael L. Moskowitz, Esq.
Weltman & Moskowitz, LLP
270 Madison Avenue (Suite 1400)
New York, NY 10016
    *Attorneys for Debtor
    G.A.F. Seelig, Inc.*

Richard Howard, Esq.
Adrienne Woods, Esq.
Meltzer Lippe Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, NY 11501
    *Attorneys for Debtor
    G.A.F. Seelig, Inc.*

Jae W. Chun, Esq.
Friedman & Anspach
1500 Broadway
New York, NY 10036
    *Attorneys for Local 584 Pension
    Trust Fund*

Gabriel Del Virginia, Esq.
The Law Offices of Gabriel Del Virginia
30 Wall Street-12th Floor,
New York, NY 10005
    *Attorneys for Rodney Seelig and
    Wendy Seelig*

March 19, 2020

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

      G.A.F. Seelig, Inc. ("G.A.F."), a major regional distributor of dairy products, filed this Chapter 11 bankruptcy case on December 30, 2017.  At the time of filing, the company was in dire financial straits, and it sought bankruptcy protection and the opportunity to reorganize in order to address its debts, including a large liability owed to Local 584 Pension Trust Fund (the "Pension Fund"), a multi-employer benefit fund that provides pension and retirement benefits to employees, retirees, and their dependents, as well as obligations owed to Rodney Seelig, G.A.F.'s President and 90 percent owner.  G.A.F. hoped to proceed with a prompt sale of its business operations through this bankruptcy case to another company in the dairy industry.

      But it did not work out that way.  Instead, at this stage in this Chapter 11 case, a number of questions have been raised by the Pension Fund, G.A.F., Mr. Seelig, and others, under both bankruptcy and non-bankruptcy law.  Significant interests are at stake, and the interplay of the Bankruptcy Code, ERISA, and other statutes is implicated.  Objections to claims have been asserted by G.A.F. and the Pension Fund.  Stay relief has been requested by the Pension Fund, so that it can pursue its ERISA claim in the federal district court, not the bankruptcy court.

      Before any of those questions is ripe for decision, this Court considers a threshold question – whether G.A.F.'s Chapter 11 bankruptcy case is a bad faith filing triggering the consequences of Bankruptcy Code Section 1112(b), including conversion or dismissal.  The Pension Fund argues that dismissal of G.A.F.'s bankruptcy case is appropriate because G.A.F. filed this case in bad faith, with the principal and unlawful purpose of avoiding its withdrawal liability to the Fund.

## This Motion To Dismiss

On February 16, 2018, the Pension Fund filed a Motion to Dismiss or, in the alternative, to Lift the Automatic Stay.  The Pension Fund filed several documents in support of the relief sought in the Motion to Dismiss, including six memoranda of law.  And G.A.F., in turn, has filed several documents in opposition to the dismissal of this case and other relief sought in this motion, including four memoranda of law.  G.A.F. also joined in an affirmation in opposition to the Motion to Dismiss filed by Esbenshade Inc., one of its creditors.  The issues presented in the motion have been addressed by the parties and the Court over a period of time in a series of filings, case conferences, and hearings, and the record and context of the motion has grown and evolved as this bankruptcy case has progressed.  Over this same period, the parties have worked diligently to see if a consensual resolution of these matters could be reached.

On July 2, 2019, following a series of conferences and hearings on the motion and related issues, and in the interests of fair and efficient case management, the Court directed the parties to submit memoranda addressing, as a threshold matter, the question of whether this case should be dismissed as a bad faith filing under the Bankruptcy Code.

On August 2, 2019, the Pension Fund filed a consolidated memorandum of law in support of its motion to dismiss, arguing that G.A.F.'s bankruptcy case should be dismissed for cause under Bankruptcy Code Section 1112(b) as a bad faith filing with the unlawful purpose of violating Section 4212(c) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1392.  On August 30, 2019, G.A.F. filed an opposition memorandum of law.  And on September 13, 2019, the Pension Fund filed a reply memorandum of law.  The Court held argument on the Motion to Dismiss on January 24, 2020, at which the parties, by counsel,

appeared and were heard, and closed the record.  And on March 6, 2020, the Court held a

continued hearing on the motion and reserved decision.

## Jurisdiction

This Court has jurisdiction pursuant to Judiciary Code Sections 157(b)(1) and 1334(b),

and the Standing Order of Reference dated August 28, 1986, as amended by the Order dated

December 5, 2012, of the United States District Court for the Eastern District of New York.  In

addition, this Court may adjudicate these claims to final judgment to the extent that they are core

proceedings pursuant to Judiciary Code Section 157(b), and to the extent that they are not core

proceedings, pursuant to Judiciary Code Section 157(c) because the parties have stated their

consent to this Court entering a final judgment.  *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S.

Ct. 1932, 1940 (2015) (holding that in a non-core proceeding, a bankruptcy court may enter final

orders "'with the consent of all the parties to the proceeding'") (quoting 28 U.S.C. § 157(c)(2)).

## Background

*The Parties*

G.A.F. was a family-owned company that engaged in the sale and distribution of fine

foods and dairy products to customers.  It provided a wide range of dairy products in New York,

New Jersey, and Connecticut to its customers, and those customers included "over 600 hotels,

fine dining restaurants, corporate fining facilities, hospital, baking manufacturers, the cruise

industry, and other food service providers."  ECF No. 5, Seelig Aff. ¶ 6.  According to G.A.F., it

had eighty-six employees, approximately sixty of whom were members of Local 553 of the

International Brotherhood of Teamsters (the "Union").  Seelig Aff. ¶ 8.

The Pension Fund is "a multi-employer employee benefit fund that is jointly administered

by trustees designated by [the Union] and by sponsoring employers" that "provides pension and

3

retirement benefits to covered employees, retirees, and their dependents." ECF No. 102-1, Spinelli Aff. ¶¶ 3-4. The Pension Fund has approximately eleven participating employers, and they all operate in the milk industry in the greater New York City metropolitan area. Spinelli Aff. ¶ 7. G.A.F. was a participating employer in the Pension Fund. "There are approximately 445 active employees who are earning pension credits and 1,708 individuals who currently receive or are entitled to receive pension benefits from the Pension Fund." Spinelli Aff. ¶ 8. Of these, sixty formerly were employed by G.A.F. Seelig Aff. ¶ 8.

*G.A.F.'s Chapter 11 Bankruptcy Case*

This case has a long history in this Court. On December 30, 2017, G.A.F. filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. G.A.F. states that as a result of its financial distress, it determined, in its business judgment, that the value for its creditors and other stakeholders would be maximized by sale of its assets to a financially viable purchaser. Seelig Aff. ¶ 16; Opp. ¶ 13.

Just a few days later, on January 3, 2018, G.A.F. filed a motion seeking an order authorizing and approving the sale of substantially all of its business operations in a private sale to Dairyland USA Corporation ("Dairyland"). The proposed sale was to be free and clear of all liens, claims, and interests, and the proposed purchase price was $2.125 million (the "Sale Motion"). Of particular consequence here, as part of the sale agreement, G.A.F. and Dairyland agreed that Dairyland would not assume any liabilities related to "(i) workers' compensation matters, (ii) any collective bargaining agreement to which Debtor is or was a party, and (iii) the funding or underfunding of any multi-employer pension plan to which Debtor is or was a party." ECF No. 14, Sale Motion ¶ 4. The sale agreement also provided for the payment of a $400,000 consulting fee to Mr. Seelig, within a year of the sale. Sale Motion Exh. 1 ¶ 30.

On January 25, 2018, after the deadline to object to the Sale Motion had passed, G.A.F. advised the Court that the terms of the sale to Dairyland changed.  Significantly, the proposed purchase price dropped from $2.125 million to $250,000.  *See* ECF Nos. 59, 72.

Less than two weeks later, on February 6, 2018, following several conferences among the parties and the Court, G.A.F. withdrew the Sale Motion, as evidenced by a "So Ordered" entry on the case docket.  And ten days after that, on February 16, 2018, the Pension Fund filed its motion seeking dismissal of this bankruptcy case or, in the alternative, relief from the automatic stay.

As described above, the Pension Fund and G.A.F. address many issues in the context of that motion, in at least four memoranda in support and three opposition memoranda.  From time to time, and on July 2, 2019, the Court held hearings on G.A.F.'s requests for relief.  And as also described above, at the July 2, 2019 hearing, the Court set a briefing schedule for the parties to file consolidated memoranda and supporting documents addressing the threshold question of whether this bankruptcy case should be dismissed as a bad faith filing.

On August 2, 2019, the Pension Fund filed the Consolidated Memoranda.  G.A.F. filed its opposition to the Consolidated Memoranda on August 30, 2019.  And on September 13, 2019, the Pension Fund filed a reply to the Opposition.

And as noted above, on January 24, 2020, the Court heard argument on the Pension Fund's Motion to Dismiss, at which the Pension Fund, G.A.F, and the United States Trustee appeared and were heard, and the Court closed the record.  On March 6, 2020, the Court held a continued hearing on the motion and reserved decision.

*G.A.F.'s Arguments as to Its Financial Condition Prior to Filing for Bankruptcy*

One piece of the picture presented by this record is G.A.F.'s financial condition at the time that it filed for bankruptcy.  When this case was filed, G.A.F. stated that its annual sales ranged between $40 million and $50 million per year, with a gross revenue of $43,176,177 in 2016.  Seelig Aff. ¶ 10.  G.A.F. projected that its gross revenue would rise to approximately $51.5 million in 2017.  Seelig Aff. ¶ 10 n. 1.

G.A.F. states that from 2013 to 2017, despite its substantial gross annual revenue, its profits were modest.  As G.A.F. explains, "[f]or the five (5) years prior to December 30, 2017 . . . [G.A.F.]'s operating results could be termed marginal at best.  During this time, [G.A.F.] produced a profit of less than 1/3 of one percent; put more succinctly, during this period [G.A.F.] lost money."  Opp. Exh. B ¶ 4.  G.A.F. attributes its low profit margin to the loss of several clients due to the high level of competition in the dairy industry and an increase in its expenses and liabilities.

In particular, G.A.F. states that in 2017, it lost several important clients, including Blue Apron, Hilton Hotels, and Starwood Hotels.  Further, G.A.F. states that despite signing a new contract with Queensboro Farm Products, Inc. ("Queensboro") in 2017, which increased its prospective gross revenue, the contract yielded a low profit margin.  According to G.A.F., the contract with Queensboro was labor-intensive, and a major departure from its regular distribution business, as evidenced by a $73,000 drop in gross profit despite an estimated $7 million increase in sales revenue that year.  Opp. Exh. B ¶ 7.

Additionally, G.A.F. argues that it its liabilities significantly increased in 2017.  It states that beginning in August 2017, it was required to make monthly payments in the amount of $12,600, as the result of a settlement entered into with the New York State Insurance Fund (the "NYSIF").  Seelig Aff. ¶ 14.  According to G.A.F., these monthly payments were in addition to

6

its NYSIF insurance premiums, which increased from $610,000 to $1.6 million for the 2016-17 year.  Opp. Exh. B ¶¶ 5-6.  G.A.F. also notes that it was required to make a $4,095 monthly payment to the New York State Workers' Compensation Board pursuant to a settlement agreement entered into in 2013.  Seelig Aff. ¶ 15 n. 2.  Finally, as a participating employer in the Pension Fund, G.A.F. was required to make monthly contributions to the Pension Fund on behalf of its covered employees.  As a result, G.A.F. states that in 2017 it operated with a gross profit margin of only nineteen percent, which was significantly below its 2013 gross profit margin of twenty-seven percent.

### *G.A.F.'s Current Financial Condition*

Another piece of the picture is G.A.F.'s present situation.  G.A.F. is no longer operating. It states that as of February 2020, it had $3,145,438.65 in its debtor-in-possession bank account, principally from the sale of certain assets and the collection of accounts receivable.

The record shows that some 106 claims have been filed by creditors, and these claims total $8,711,336.26.  Certain claims are of particular note.  The Pension Fund has filed two claims to collect G.A.F.'s withdrawal liability totaling $3,107,088, as consequence of its withdrawal from the Pension Fund (the "Pension Fund Claims").  In addition, Mr. Seelig, G.A.F.'s principal and former President, has filed two claims as a creditor.  One is for $470,500 for his unpaid wages from 2014 through 2017.  And the other is for $995,568, for funds that he advanced on behalf of G.A.F. pursuant to a letter of credit.  These two claims total $1,466,068.

### *The Pension Fund's Arguments in Support of Dismissal*

The Pension Fund argues that dismissal for cause under Bankruptcy Code Section 1112(b) is warranted because, in substance, this case was filed in bad faith in order to permit G.A.F. to avoid payment of its withdrawal liability from the Pension Fund.  It points to ERISA

Section 4212, which provides that "[i]f a principal purpose of any transaction is to evade or avoid [withdrawal] liability . . . [then] . . . liability shall be determined and collected . . . without regard to such transaction."  29 U.S.C. § 1392(c).

The Pension Fund argues that three events in this case meet the requirement of a "transaction" to "avoid" withdrawal liability by G.A.F. under ERISA Section 4212.  These are first, the "transaction" evidenced by the reduction of the sale price to be paid by Dairyland from $2.125 million to $250,000; second, the "series of transactions" reflected in G.A.F.'s objection to the Pension Fund's Claims and dilution of the unsecured claims by Mr. Seelig's large claims; and third, the proposed "transaction" of confirming a Chapter 11 plan.

The Pension Fund argues that the proposed sale of G.A.F.'s business is a "transaction" with the principal purpose of avoiding withdrawal liability for purposes of ERISA Section 4212. The Pension Fund further argues that the dramatic drop in the price to be paid, from $2.125 million to $250,000, demonstrates G.A.F.'s intent to avoid its withdrawal liability in several ways.  It asserts that G.A.F. knew that the reduced sale price would eliminate any recovery by the Pension Fund because the sum would be consumed by claims with a higher priority, including inflated administrative expenses, other priority claims, and the NYSIF claim.

At oral argument, the Pension Fund argued that G.A.F. knew that the reduced sale price would eliminate any recovery by the Pension Fund, because the sum was insufficient to cover the withdrawal liability and the workers' compensation liability, yet G.A.F. moved forward with the sale in order to avoid paying those amounts.

The Pension Fund also argues that the reduced sale price of $250,000 simply is not adequate consideration for the sale of a 150-year-old business with over 600 customers and annual sales ranging between $40 and $50 million.  Finally, the Pension Fund argues that the

timing of the reduction in the sale price demonstrates G.A.F.'s intent to avoid its withdrawal liability because it shows that G.A.F. waited to lower the price until no other potential bidders were interested in purchasing G.A.F.'s assets, and then waited again until after the deadline to object to the sale had passed to announce the reduction.

The Pension Fund also argues that after the sale to Dairyland fell through, G.A.F. attempted to avoid its withdrawal liability in an additional way that amounts to a "transaction" under ERISA Section 4212, by objecting to the Pension Fund's claim.  Consolidated Memoranda ¶¶ 112, 116.  The Pension Fund states that G.A.F. is attempting to avoid its withdrawal liability by claiming that the company has no value and, therefore, its calculated withdrawal liability under ERISA Section 4225(a) amounts to zero.  And the Pension Fund argues that G.A.F. diluted the unsecured claims with Mr. Seelig's meritless claims, because Mr. Seelig and G.A.F. are the same entity.  The Pension Fund argues that Mr. Seelig only filed his claims after the proposed sale fell through, and he would no longer be receiving a $400,000 consultation fee by Dairyland. The Pension Fund contrasts G.A.F.'s objection to its claim with G.A.F.'s determination not to object to the large claims asserted by Mr. Seelig, its principal.  This failure to object to Mr. Seelig's claims, the Pension Fund argues, reveals G.A.F.'s bad faith and demonstrates that it is not acting in the best interests of the estate.

Finally, the Pension Fund argues that dismissal under Section 1112(b) is warranted because G.A.F. has proposed a Chapter 11 plan that cannot be confirmed, and this too amounts to a "transaction" under ERISA Section 4212.  It notes that Section 1129(a)(3) prohibits the Court from confirming a plan that is "not proposed in good faith and that is forbidden by law." As a consequence, the Pension Fund urges, ERISA Section 4212(c) forbids G.A.F. from filing for bankruptcy protection with the "principal purpose" to "avoid" its withdrawal liability, and

any Chapter 11 plan that G.A.F. might propose violates the law and cannot be confirmed. Consolidated Memoranda ¶ 121. For these same reasons, the Pension Fund argues that G.A.F.'s Chapter 11 plan is "forbidden by law" and cannot be confirmed Bankruptcy Code Section 1129(a)(3) because ERISA Section 4212 permits the Pension Fund immediately to collect on the withdrawal liability.

*G.A.F.'s Opposition*

G.A.F. disputes that it filed its bankruptcy case with the intention of evading or avoiding its obligations to the Pension Fund. It argues that its sale negotiations with Dairyland were prompted by its financial distress. And it asserts that at every stage in this bankruptcy case, it has acted in its fiduciary role to maximize distributions to all of the creditors of the estate.

G.A.F. disputes that it somehow engineered the dramatic drop in the sale price from $2.125 million to $250,000. It states that this reduction was not a tactic, and that "[i]t was [Dairyland], not [G.A.F.], that lowered its offering price for Debtor's assets." Opp. ¶ 2. And it states that the market, not G.A.F., determined that $250,000 was the best offer available. G.A.F. states that the value of its business declined precipitously after it lost many of its customers, because its value was tied to those relationships – not to physical assets such as a building or equipment. G.A.F. also argues that its situation reflects the conditions in the dairy industry more generally, and notes that "many dairies suffered profitability issues as a result of a decrease in consumption of dairy products over the last decade leading to a stark decrease in the number of dairies in New York State and elsewhere." Opp. ¶ 16.

Next, G.A.F. argues that the Pension Fund has not identified any specific misrepresentation that it made in its objections to the Pension Fund's claims. It states that filing an objection to the Pension Fund's Claims is not indicative of a desire to deprive the Pension

10

Fund of anything to which it is lawfully entitled. Rather, G.A.F. argues, it has an obligation to *all* of its creditors to object to *any* claim that is "incorrect, overstated, or erroneous." Opp. ¶ 3. G.A.F. argues that its counsel reviewed the Pension Fund Claims and "determined [that it] had a fiduciary duty to object to Pension Fund's [Claims], which were significantly overstated at best and most likely valueless." Opp. ¶ 18. Similarly, G.A.F. asserts that its counsel reviewed Mr. Seelig's claims and supporting documentation and determined that it had no basis to object to Mr. Seelig's claims. According to G.A.F., Mr. Seelig filed timely proofs of claims, seeking repayment of legitimate and unobjectionable expenses that he incurred in the form of unpaid wages and payments on a letter of credit. G.A.F. argues that in making these determinations, it is acting in the interest of the Debtor, not in the interests of Mr. Seelig. And it also notes that while Mr. Seelig is an insider, he is also a private individual and a creditor, represented by his own counsel, with the right to file claims to be paid.

Finally, G.A.F. disputes that it is unable to file a confirmable plan, because "the only bar to filing a confirmable plan is the resolution of the few outstanding claims objections." Opp. ¶ 19. For all these reasons and more, G.A.F. argues, the Pension Fund has not established that G.A.F. filed this Chapter 11 bankruptcy case for the principal purpose of evading or avoiding its withdrawal liability.

### **The Applicable Law**

#### *Bankruptcy Code Section 1112(b)*

Bankruptcy Code Section 1112(b) provides that "on request of a party in interest, and after notice and a hearing, the court shall convert a case under [chapter 11] to a case under chapter 7 or dismiss [it], whichever is in the best interests of creditors and the estate," if the court determines cause has been established by the movant. 11 U.S.C. § 1112. *See In re Babayoff*,

445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011) (stating that "the movant bears the burden of establishing cause by a preponderance of the evidence.").

If cause exists, then some form of relief is mandatory.  As one bankruptcy court observed:

> the Court must dismiss or convert the case, or appoint an operating trustee pursuant to 11 U.S.C. § 1104(a) unless (i) there are "unusual circumstances" that would warrant denial of the motion, and (ii) the debtor or any other party in interest establishes that there is a reasonable likelihood of plan confirmation and justification for and seasonable cure of the grounds giving rise to cause.

*In re E. End Dev., LLC*, 491 B.R. 633, 641 (Bankr. E.D.N.Y. 2013) (quoting 11 U.S.C. § 1112(b)).

Section 1112(b)(4) provides a "non-exhaustive" list of examples of cause.  *In re AAGS Holdings LLC*, 608 B.R. 373, 382 (Bankr. S.D.N.Y. 2019) (citing *C-TC 9th Ave. P'shp v. Norton Co.* (*In re C-TC 9th Ave. P'shp*), 113 F.3d 1304, 1311 (2d Cir. 1997)).  In considering a motion to dismiss, "the court may consider other grounds and use its equitable powers to reach an appropriate result."  *In re AdBrite Corp.*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) (citing *In re C-TC 9th Ave. P'shp*, 113 F.3d at 1310).

The determination that a Chapter 11 case has been filed in bad faith leads to serious consequences.  As the Second Circuit has recognized, the filing of a bankruptcy petition in bad faith is cause for dismissal or conversion, and dismissal may occur in response to a party's request or by the court on its own motion.  *In re C-TC 9th Ave. P'shp*, 113 F.3d at 1310 (stating that a "bankruptcy court may dismiss a bad faith filing on an interested party's motion or *sua sponte*.").

<u>*ERISA and Withdrawal Liability*</u>

Title 29 of the United States Code contains federal labor laws, and governs, among other things, an employer's withdrawal liability in a multiemployer defined benefit pension plan under ERISA and the Multiemployer Pension Plan Amendment Act (the "MPPAA").  29 U.S.C. §§ 1001, *et seq.*  ERISA Section 4201 provides that withdrawal liability is triggered "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal," and in that circumstance, "then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."  29 U.S.C. § 1381(a).

ERISA Section 4212 provides that "[i]f a principal purpose of any transaction is to evade or avoid liability under this part, this part shall be applied (and liability shall be determined and collected) without regard to such transaction."  29 U.S.C. § 1392(c).  The terms "evade or avoid liability" are not defined by ERISA, and are construed in accordance with their ordinary meanings.  *Lopresti v. Pace Press, Inc.*, 868 F. Supp. 2d 188, 201 (S.D.N.Y. 2012).  "In order to meet its burden, [the Pension Fund] must establish that evading or avoiding withdrawal liability was a *principal* purpose of the transaction, as opposed to a minor or subordinate purpose."  *Id.* (emphasis in original).

### Discussion

The threshold question presented by this motion is whether G.A.F.'s Chapter 11 bankruptcy case is a bad faith filing triggering the consequences of Bankruptcy Code Section 1112(b), including conversion or dismissal.  This calls for the Court to consider whether bad faith can be established by an ERISA violation; and if so, whether the Pension Fund has shown that G.A.F. has engaged in a "transaction" with the principal purpose to evade or avoid its withdrawal liability under ERISA.  The Court considers these questions in turn.

*Whether Bad Faith Can Be Established by an ERISA Violation*

The Court first considers whether bad faith can be established by a demonstrated violation of ERISA.  It is a cornerstone of the Bankruptcy Code that a debtor must file a petition in good faith, and "'it is well established that bad faith may serve as a ground for dismissal of a bankruptcy petition.'"  *In re Hartford & York LLC*, No. 13-45563-ESS, 2014 WL 985449, at *3 (Bankr. E.D.N.Y. Mar. 13, 2014) (quoting *In re GEL, LLC*, 495 B.R. 240, 246 (Bankr. E.D.N.Y. 2012)).  As the Fourth Circuit has observed, "a good faith filing requirement is implicit in several specific provisions of the bankruptcy code, interpreted in light of established policy considerations underlying the code's provision of bankruptcy protection."  *Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989).

But the threshold for a determination of bad faith is high, and "[d]ismissal for bad-faith filing should ordinarily be restricted to those instances where it can be clearly and convincingly shown that a debtor filed . . . to accomplish an otherwise unlawful purpose through use of the Bankruptcy Code."  *In re Mill Place Ltd. P'ship*, 94 B.R. 139, 141-42 (Bankr. D. Minn. 1988).

At the outset, the parties do not dispute that ERISA Section 4212 applies to G.A.F.'s actions in this bankruptcy case.  The Court concurs.  That is, "bad faith" for purposes of Section 1112(b) may be established by an ERISA violation.  Therefore, the only issue before the Court is whether the Pension Fund has established that in the context of this bankruptcy case, G.A.F. entered into a "transaction" with the principal purpose or intent to evade or avoid its withdrawal liability under ERISA.  If this showing is made, then G.A.F.'s bankruptcy case was filed or pursued to accomplish an unlawful purpose, and there is cause to dismiss or convert this case under Bankruptcy Code Section 1112(b) as a bad faith filing.

The term "transaction" is not defined by ERISA, and therefore should be construed in accordance with its ordinary meaning.  *SUPERVALU, Inc. v. Bd. of Trs. of SW Penn. & W. Md.*

*Area Teamsters & Emp'rs Pension Fund*, 500 F.3d 334, 340 (3d Cir. 2007), *cert. denied*, 552 U.S. 1182 (2009).  One court of appeals looked to the dictionary definition of "transaction," and observed that "[t]he noun 'transaction' means '[t]he act of transacting or the fact of being transacted,' and the verb 'transact' means '[t]o do, carry on, or conduct' or '[t]o conduct business.'"  *SUPERVALU, Inc.*, 500 F.3d at 341. (quoting Am. Heritage Dictionary 1899-1900 (3d ed. 1992)).

In applying Section 4212, several courts have found that an employer's action was a "transaction" within the meaning of Section 4212 where the action could be invalidated or unwound.  For example, the Second Circuit determined that a sale of substantially all of the assets of the withdrawing employer's business is a "transaction" under ERISA Section 4212. *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1059 (2d Cir. 1993).  *See Lopresti*, 868 F. Supp. 2d at 201 (finding that the sale of the debtor's assets is a "transaction" subject to ERISA Section 4212).

Other circuits have followed similar paths.  The Third Circuit found that the renegotiation of a collective bargaining agreement to withdrawal liability was a "transaction" for these purposes.  *SUPERVALU, Inc.*, 500 F.3d at 342.  In addition, the Sixth Circuit determined that a parent corporation's sale of a subsidiary to an underfunded entity, followed by the subsidiary's prompt filing for bankruptcy, is a "transaction" subject to Section 4212.  *Sherwin-Williams Co. v. N.Y. State Teamsters Conference Pension and Ret. Fund*, 158 F.3d 387, 396 (6th Cir. 1998).  To the same effect, the Seventh Circuit determined that a sale of a subsidiary's stock, rather than its assets, when the sale was found to be structured to avoid withdrawal liability, is a "transaction" that violated Section 4212.  *Santa Fe Pac. Corp. v. Cent. States, SE and SW Areas Pension Fund*, 22 F.3d 725, 729 (7th Cir. 1994).

At least one court has concluded that an employer's actions leading up to and during a bankruptcy case are "transactions" within the meaning of ERISA Section 4212.  In *Bricklayers & Trowel Trades Int'l Pension Fund v. Wasco, Inc.* (*In re Wasco*), 551 B.R. 319 (M.D. Tenn. 2015), the district court held that a series of financial transactions entered into by the debtors, and the debtors' confirmed Chapter 11 plan, were "transactions" in violation of ERISA.  *In re Wasco*, 551 B.R. at 337.  The court observed that the debtors' pre-petition transactions included "pouring vast sums of money into bonuses, additional compensation, additional expense reimbursement, additional car allowances, insider pension fund payments, and also significant advances made to allow insiders to acquire [a company] in Kentucky."  *In re Wasco*, 551 B.R. at 334.  As a result, the court concluded that "the Bankruptcy Court erred in confirming the Plan, which was created by a 'means forbidden by law,' and was not 'proposed in good faith'".  *Wasco*, 551 B.R. at 337 (quoting 11 U.S.C. § 1129(a)(3)).

That is, a "transaction" for purposes of ERISA Section 4212 must be, in substance, something that has been undertaken or completed, and something that can be invalidated or unwound.  As the Second Circuit observed:

> [T]o calculate and collect liability, "without regard to such transaction," any assets that were transferred in order to "evade or avoid liability," as well as the parties to whom they were improperly transferred, must be within the reach of the statute. Further, to apply the MPPAA "without regard to such transaction," the transferor entity must be deemed to be in possession of improperly transferred assets.  Those assets must therefore be recoverable from the parties to whom they have been illegitimately transferred.

*IUE AFL-CIO Pension Fund*, 9 F.3d at 1056 (quoting 11 U.S.C. § 1129(a)(3)).  So, in the business context, a "transaction" should be more than a business proposal, a term sheet, an offer, or a negotiating position.  Instead, as in *IUE AFL-CIO Pension Fund*, a transaction may be a sale of a business's assets.  As in *SUPERVALU*, it may be the entry into a new collective bargaining

agreement.  And as in *Sherwin-Williams,* it may be the sale and subsequent bankruptcy filing of a subsidiary.  Each of these is an event that has been undertaken or completed, and each can be invalidated or unwound.

And in the bankruptcy context, a "transaction" similarly should be more than the filing of a motion, an adversary proceeding, a proposed Chapter 11 plan of reorganization, or an asserted claim or a claim objection.  Each of these is neither more nor less than a step in the progress of the bankruptcy case, each invites a response, and each comes with notice and an opportunity to respond before any action is taken by the court.  And none of these, standing alone, is an event that has been undertaken or completed, or something that can be invalidated or unwound.  That is, none of these, without more, is a "transaction" for purposes of ERISA Section 4212.

The Pension Fund argues that three actions in this case meet the requirement of a "transaction" to "evade or avoid" withdrawal liability by G.A.F.  These are first, the reduction of the sale price to be paid by Dairyland for G.A.F.'s business from $2.125 million to $250,000; second, the filing of substantial claims by G.A.F.'s principal Mr. Seelig and the resulting dilution of the pool of unsecured claims together with G.A.F.'s assertion of objections to the Pension Fund's claims; and third, G.A.F.'s proposed "transaction" of confirming a Chapter 11 plan.

That is, if the Pension Fund demonstrates that any of these circumstances is a "transaction" that was entered into with the "principal purpose . . . to evade or avoid [withdrawal] liability," then the terms of ERISA Section 4212 and Bankruptcy Code Section 1112(b) will point to the conclusion that this Chapter 11 case should be converted to one under Chapter 7, or dismissed.  The Court considers each of those arguments in turn.

*Whether the Pension Fund Has Shown that G.A.F. Lowered the Sale Price with the Principal Purpose To Evade or Avoid Its Withdrawal Liability Under ERISA*

The Pension Fund argues that the reduction of the sale price to be paid by Dairyland for substantially all of G.A.F.'s business operations from $2.125 million to $250,000, is a "transaction" undertaken by G.A.F. with the principal purpose to evade or avoid its withdrawal liability to the Pension Fund under ERISA.

The Court first considers whether the Pension Fund has shown that the reduction in the sale price amounts to a "transaction" for purposes of ERISA Section 4212. As noted above, a "transaction" for these purposes must be, in substance, something that has been undertaken or completed, and something that can be invalidated or unwound.

Here, the record shows that the G.A.F. and Dairyland entered into an agreement for Dairyland to purchase substantially all of G.A.F.'s business operations for $2.125 million – and then, due to the rapid deterioration in G.A.F.'s business, agreed to a substantially reduced sale price of $250,000.

But the record does not show, and the Pension Fund does not suggest, that this proposed transaction – at either the original or the reduced price – was completed. Nor does the record indicate that there was anything that could be undone or unwound. To the contrary, the proposed transaction could not proceed without court approval, and even the motion seeking that approval was ultimately withdrawn by G.A.F. Notably, the Pension Fund has been an active participant at each step of these proceedings.

So, as a threshold matter, the Pension Fund has not established that G.A.F.'s proposed sale of its business operations to Dairyland, and in particular, the drop in the sale price from $2.125 million to $250,000 is a "transaction" for purposes of ERISA Section 4212.

The Court next considers whether the Pension Fund has shown that G.A.F.'s proposed sale of its business operations, and the reduction in the sale price – if somehow that amounts to a

"transaction" for purposes of ERISA Section 4212 – was undertaken by G.A.F. in order to avoid its withdrawal liability under ERISA.

And here too, the record does not show that the steep drop in the sale price to be paid by Dairyland was somehow engineered by G.A.F. in order to avoid its withdrawal liability under ERISA.  Indeed, and to the contrary, the record points to the fact that nearly from the outset of this Chapter 11 case, G.A.F. stated that its business continued to deteriorate as a consequence of the highly competitive conditions in the dairy industry, coupled with a declining demand for dairy products.  The record also shows that these circumstances and the market, not any motive to avoid withdrawal liability, drove down the price that Dairyland was prepared to pay for G.A.F.'s business operations.

In particular, the record shows that G.A.F.'s customer relationships were essential to the value of its business, and that those relationships were vulnerable to competition because they are preserved through a series of individual purchase order agreements.  As Mr. Seelig stated, "[i]t is crucial to note that Debtor's customers do not have long-term supply contracts with Debtor, but rather manage all their contractual relationships for the supply of goods through a series of individual purchase orders, such that Debtor's customers would easily be able to re-source the products they buy from Debtor."  Seelig Aff. ¶ 11.

The fragility of G.A.F.'s revenues was also described by Dairyland.  Dairyland stated that G.A.F.'s business would be "irreparably harmed" if the sale did not take place as originally contemplated.  ECF No 77, Letter from Dairyland to the Court dated January 31, 2018 ("Dairyland Letter").  Dairyland stated that in one week "G.A.F. has lost accounts valued at approximately $10 million of annual revenue, approximately 20% of G.A.F.'s business." Dairyland Letter at 1.  Additionally, according to Dairyland, G.A.F.'s former sale representatives

were actively disrupting the remaining customer relationships, and hurting the value of G.A.F.'s business, with the result that Dairyland would not proceed with the sale transaction if the sale was delayed any further.  None of these facts was effectively contradicted by the Pension Fund.

These conclusions are consistent with those reached by courts in similar circumstances. While the Pension Fund argues that after the administrative expenses in this bankruptcy case are paid, there may be little or no funds remaining to pay the withdrawal liability, this is not the same as entering into a transaction to avoid that liability.  As other courts have acknowledged, "there is a difference between knowing that the result of the transaction would be that withdrawal liability would not be paid and designing the transaction with a principal purpose of achieving this result."  *Lopresti*, 868 F. Supp. at 204 (*citing Teamsters Joint Council No. 83 of Va. Pension Fund v. Empire Beef Co.*, No. 08 Civ. 340, 2011 WL 201492, at *3 n.5 (E.D. Va. Jan. 20, 2011)) (stating that "[a]rguably, eschewing withdrawal liability was merely an incidental effect – not an actively contemplated purpose – of the Agreement.").

In addition, here, the reduction in the sale price affected not only the Pension Fund's prospects of a recovery.  Instead, it affected – and significantly diminished – the amount that would be paid to all of G.A.F.'s creditors, including Mr. Seelig, G.A.F.'s principal.  It is hard to see why G.A.F. would deliberately negotiate away the prospect of a substantial recovery for all of its creditors in order to avoid its liability to the Pension Fund.

That is, here, the Pension Fund has not established that G.A.F.'s proposed sale of its business operations to Dairyland, or the reduction in the sale price from $2.125 million to $250,000, was undertaken by G.A.F. with the principal purpose of avoiding its withdrawal liability to the Pension Fund.

*Whether the Pension Fund Has Shown that G.A.F. and its Principal Mr. Seelig Filed Claims and*
*Objected to the Pension Fund Claims with the Principal Purpose To Evade or Avoid Its*
*Withdrawal Liability Under ERISA*

The Pension Fund argues that G.A.F. and its principal Mr. Seelig have used the claims

process to avoid G.A.F.'s withdrawal liability under ERISA in two ways that amount to

"transactions" under ERISA Section 4212.  First, the Pension Fund argues that G.A.F. and Mr.

Seelig diluted the unsecured claims – and the Pension Fund's prospects of a recovery – by filing

large and baseless claims for unpaid wages of $470,500 and a letter of credit in the amount of

$995,568 that Mr. Seelig extended in connection with a letter of credit transaction.  And second,

the Pension Fund argues that G.A.F. has filed unfounded objections to its withdrawal liability

claims.  Each of these, the Pension Fund argues, is a "transaction" with the principal purpose to

avoid G.A.F.'s withdrawal liability under ERISA.

The Court first considers whether the Pension Fund has shown that Mr. Seelig's filing of

large claims in this bankruptcy case, and G.A.F.'s objections to the Pension Fund's own claims,

amount to "transactions" for purposes of ERISA Section 4212.  That is, the Court must address

whether any of these actions, like the "transactions" that have been identified by other courts, is,

in substance, something that has been undertaken or completed, and something that can be

invalidated or unwound.

Here, the record shows that Mr. Seelig and G.A.F. took these steps – filing and objecting

to claims – strictly in the context of this Chapter 11 case.  Claims and claims objections are part

of the progress of a Chapter 11 case.  And indeed, the Pension Fund has objected to Mr. Seelig's

claims, and responded to G.A.F.'s objection to its own claims.  All of these disputes will be

adjudicated on the merits by this Court.

At the same time, the record does not show that Mr. Seelig or G.A.F. has accomplished anything more than to make filings that are routine in the context of a Chapter 11 case, or undertaken or completed anything that could be invalidated or unwound.  If the Pension Fund succeeds in its objections to Mr. Seelig's claims, or G.A.F. succeeds in its objections to the Pension Fund's claims, then they will be modified accordingly.  But the fact of those disputes and the prospect of payment – or lack of payment – does not turn the parties' claims and claims objection process into a "transaction" for purposes of ERISA Section 4212.

Accordingly, the Pension Fund has not established that Mr. Seelig's filing of large unsecured claims, or G.A.F.'s objections to the Pension Fund's claims, is a "transaction" for purposes of ERISA Section 4212.

The Court next considers whether the Pension Fund has shown that Mr. Seelig's filing of claims, or G.A.F.'s objections to its claims – if, again, somehow these amount to "transactions" for purposes of ERISA Section 4212 – were undertaken by G.A.F. and its principal Mr. Seelig in order to avoid G.A.F.'s withdrawal liability under ERISA.

Here, the record shows that in G.A.F.'s initial bankruptcy filings, it stated that a private asset sale was required because it was recently valued at zero dollars in a liquidation scenario by an independent appraiser.  Using this valuation, G.A.F. argued in its objection to the Pension Fund's claims that it has no withdrawal liability under ERISA Section 4225(a).  G.A.F. argues that it is acting consistent with its fiduciary duty to all of the creditors to object to claims that it believes to be overstated.  While it is far from clear that G.A.F. will succeed in this argument, making the argument does not amount to an impermissible purpose to avoid liability to the Pension Fund.

This is consistent with the claims objection process as set forth in the Bankruptcy Code. Bankruptcy Code Section 502 provides that any party in interest may file an objection to a claim made by a creditor.  11 U.S.C. § 502(a).  If an objection to a claim is made, then after notice and a hearing, the court "shall determine the amount of such claim . . .  and shall allow such claim . . . except to the extent that such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).

So, by objecting to the Pension Fund's claims, G.A.F. does neither more nor less than follow the steps in the claims objection process as set forth in the Bankruptcy Code.  Under both ERISA and the Bankruptcy Code, a court, not G.A.F., will determine how much is owed.  This is simply not the same as avoiding withdrawal liability – rather, it is a consequence of the bankruptcy process and the fiduciary duties that G.A.F. owes to all of its creditors.

That is, the Pension Fund has not shown that a principal purpose of G.A.F.'s objection to the Pension Fund's Claims is to evade or avoid withdrawal liability.  *See Empire Beef*, 2011 WL 201492, at *3 (stating that there is no "evade or avoid" liability imposed where "evading withdrawal liability was merely a collateral purpose" of the transaction in question).

Viewed another way, here, the record does not show that *any* of the claimants or objectors – including claimants Mr. Seelig and the Pension Fund, and objectors G.A.F. and the Pension Fund – is seeking to be paid more than they are entitled to, or to object on baseless grounds to the claims that have been filed by others.  Filing a proof of claim is a first step for a creditor in a Chapter 11 case, but it is not the last step.  Similarly, filing an objection to a claim simply frames an issue for the parties to address and the court to decide.  While it may be possible that *some* kind of wildly overstated claim or utterly unfounded objection could trigger

consequences under ERISA Section 4212 and Bankruptcy Code 1112(b), the record before the Court does not show, or even suggest, that such circumstances are present here.

Rather, the record shows that Mr. Seelig acted in his capacity as a creditor when he filed his claims, and G.A.F. acted in its capacity as a fiduciary to all of the creditors when it objected to the Pension Fund's Claims. It will be for the Court to determine whether the Pension Fund's objections to Mr. Seelig's claims, and G.A.F.'s objections to the Pension Fund's claims, are to be sustained or overruled. But the Pension Fund has not shown that the existence of those claims and objections in this bankruptcy case amounts to a "transaction" by G.A.F. to avoid its withdrawal liability under ERISA.

### *Whether the Pension Fund Has Shown that G.A.F.'S Prospective Chapter 11 Plan Has the Principal Purpose To Evade or Avoid Its Withdrawal Liability Under ERISA*

The Pension Fund argues that here, just as in *In re Wasco*, G.A.F.'s prospective Chapter 11 plan is a "transaction" undertaken by G.A.F. with the principal purpose to evade or avoid its withdrawal to the Pension Fund under ERISA. It argues that by using the bankruptcy process and this Chapter 11 bankruptcy case to address its withdrawal liability, G.A.F. runs afoul of ERISA Section 4212(c), and that any prospective plan that does not provide for the Pension Fund to receive the full amount that it is owed is unlawful. The Pension Fund also notes that under ERISA Section 4212(c), it should be able to collect the withdrawal liability immediately. As a consequence, the Pension Fund urges, ERISA Section 4212(c) effectively forbids G.A.F. from filing for bankruptcy protection with the "principal purpose" to "avoid" its withdrawal liability, and any Chapter 11 plan that G.A.F. might propose violates the law and cannot be confirmed.

The Court first considers whether the Pension Fund has shown that G.A.F.'s prospective Chapter 11 plan amounts to a "transaction" for purposes of ERISA Section 4212. As noted above, ERISA Section 4212 plainly applies to G.A.F.'s actions in this bankruptcy case. And as

the court found in *In re Wasco*, a debtor's Chapter 11 plan, and the pre-petition transactions associated with that plan – including the payment of "bonuses, additional compensation, additional expense reimbursement, additional car allowances, insider pension fund payments, and . . . significant advances made to . . . insiders" – can amount to "transactions" that run afoul of ERISA Section 4212. *In re Wasco*, 551 B.R. at 334. And this, in turn, can lead to the conclusion that the Chapter 11 plan "was created by a 'means forbidden by law,' and was not 'proposed in good faith.'" *Id.* (quoting 11 U.S.C. § 1129(a)(3)).

But here, the situation is different. The record does not show that G.A.F. has undertaken the kinds of pre-petition transactions identified by the court in *In re Wasco*. Nor does the record show that G.A.F. has confirmed a Chapter 11 plan – or at this stage, even filed a plan – that could amount to a "transaction" akin to the ones identified in that case. In substance, the Pension Fund argues that the proposed Chapter 11 plan that G.A.F. has described – but not filed – would treat it unfairly, and not in accordance with the requirements of either ERISA or the Bankruptcy Code.

Here again, the filing of a plan, objections to confirmation, and confirmation of the plan, are part of the progress of a Chapter 11 case. Any disputes that arise in that context, including the treatment of the Pension Fund's claim and whether G.A.F. has proposed the plan in good faith and not by any means forbidden by law, will be adjudicated on the merits by this Court.

Accordingly, the Pension Fund has not established that G.A.F.'s prospective Chapter 11 plan is a "transaction" for purposes of ERISA Section 4212.

The Court next considers whether the Pension Fund has shown that G.A.F.'s prospective Chapter 11 plan – if somehow this amounts to a "transaction" for purposes of ERISA Section 4212 – was undertaken by G.A.F. in order to avoid G.A.F.'s withdrawal liability under ERISA.

Here, the record shows that from the outset of this bankruptcy case, G.A.F. has followed a path to propose a Chapter 11 plan in response to its financial distress, to realize the value of its business and to repay its creditors.  Initially, G.A.F. proposed to pursue a sale of substantially all of its business operations.  And when that sale could not be competed, G.A.F. moved in the direction of marshalling the value of its assets through an orderly liquidation of its assets, all for the benefit of its creditors.

The Pension Fund does not point to facts that support the conclusion that G.A.F. pursued any of these paths to a Chapter 11 plan with the goal of paying some creditors, such as Mr. Seelig, but not others.  Nor has the Pension Fund shown that G.A.F. filed or pursued this Chapter 11 case as a means to shield itself from the requirements of ERISA, or to avoid its withdrawal liability to the Pension Fund.

That is, here, the Pension Fund has not established that G.A.F.'s proposed Chapter 11 plan was undertaken by G.A.F. with the principal purpose of avoiding its withdrawal liability to the Pension Fund.

### *Whether the Pension Fund Has Otherwise Demonstrated Cause for Dismissal under Bankruptcy Code Section 1112(b)*

Finally, the Court considers the question of whether, under the standards set forth in Bankruptcy Code Section 1112(b), the Pension Fund's arguments point to the conclusion that this bankruptcy case should be dismissed as a bad faith filing.

The Second Circuit has identified several factors that tend to indicate that a debtor does not have a genuine intent to reorganize or a reasonable prospect of emerging successfully from bankruptcy.  *In re C-TC 9th Ave. P'shp*, 113 F.3d at 1311.  While this decision arises in the context of a single asset real estate Chapter 11 bankruptcy case, the analysis may be helpful in other contexts as well.  *See, e.g., In re Century/ML Cable Venture*, 294 B.R. 9, 22 (Bankr.

26

S.D.N.Y. 2003) (applying *C-TC 9th Avenue* factors in the context of a cable television network business). Courts agree that in considering a motion to dismiss, "the court may consider other grounds and use its equitable powers to reach an appropriate result." *In re AdBrite Corp.*, 290 B.R. 209, 217 (Bankr. S.D.N.Y. 2003) (citing *In re C-TC 9th Ave. P'shp*, 113 F.3d at 1310).

The factors identified by the Second Circuit include:

(1)     the debtor has only one asset;

(2)     the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors;

(3)     the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt;

(4)     the debtor's financial condition is, in essence, a two-party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action;

(5)     the timing of the debtor's filing evidences an intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights;

(6)     the debtor has little or no cash flow;

(7)     the debtor can't meet current expenses including the payment of personal property and real estate taxes; and

(8)     the debtor has no employees.

*In re C-TC 9th Ave. P'shp*, 113 F.3d at 1311 (citation omitted).

These factors guide courts in considering the question of whether a bankruptcy case has been filed in good faith, and assist courts in assessing the totality of the circumstances. Depending on the situation, one or another factor may have greater weight, and the number of factors on one side or the other of the balance is not, standing alone, determinative of the outcome. The Court considers each of these factors in turn.

### *Whether G.A.F Has Only One Asset*

The first *C-TC 9th Avenue* factor is whether G.A.F. has only one asset. Here, the record shows that at the time this case was filed, G.A.F. engaged in significant business activities in the sale and distribution of fine foods and dairy products to its customers. G.A.F. had eighty-six

employees and its customers included "over 600 hotels, fine dining restaurants, corporate fining facilities, hospital, baking manufacturers, the cruise industry, and other food service providers." Seelig Aff. ¶¶ 6, 8.  G.A.F. also had accounts receivable, office furniture, office fixtures, office equipment, vehicles, machinery, a letter of credit from Mr. Seelig, and intangibles including a customer list and domain name.

Accordingly, this factor does not support the conclusion that G.A.F. filed this bankruptcy case in bad faith.

### *Whether G.A.F. Has Few Unsecured Creditors Whose Claims Are Small in Relation to Those of the Secured Creditors*

The second *C-TC 9th Avenue* factor is whether G.A.F. has few unsecured creditors, with claims that are small in relation to the claims of the secured creditors.

Here, the record shows that 106 proofs of claim have been filed, and that just three of these claims were filed by a secured creditor amounting to $13,884.60.  By contrast, the remaining proofs of claim, all filed as unsecured claims, total $8,697,451.66.

Accordingly, this factor does not support the conclusion that G.A.F. filed this bankruptcy case in bad faith.

### *Whether G.A.F.'s One Asset Is the Subject of a Foreclosure Action as a Result of Arrearages or Default on the Debt*

The third *C-TC 9th Avenue* factor is whether G.A.F.'s principal asset is the subject of a foreclosure action as a result of arrearages or default on the debt.

Here, the record shows that at the time this case was filed, G.A.F. was an operating business, with many assets – not a single principal asset.  The record also shows that at the time of filing, G.A.F. did not have a significant asset that was the subject of a mortgage foreclosure action.

Accordingly, this factor does not support the conclusion that G.A.F. filed this bankruptcy case in bad faith.

*Whether G.A.F.'s Financial Condition Is, in Essence, a Two-Party Dispute Between G.A.F. and Secured Creditors Which Can Be Resolved in a Pending State Foreclosure Action*

The fourth *C-TC 9th Avenue* factor is whether G.A.F.'s financial situation is, in essence, a two-party dispute between G.A.F. and secured creditors which can be resolved in a pending foreclosure action.

Here, the record shows that G.A.F.s financial condition is a result of many unsecured creditor claims – more than one hundred of which have been filed – including the Pension Fund's Claims.  That is, G.A.F.'s bankruptcy case is more than a two-party dispute.  And there is no pending foreclosure action in state court.

Accordingly, this factor does not support the conclusion that G.A.F. filed this bankruptcy case in bad faith.

*Whether the Timing of G.A.F.'s Filing Evidences an Intent To Delay or Frustrate the Legitimate Efforts of the Debtor's Secured Creditors To Enforce Their Rights*

The fifth *C-TC 9th Avenue* factor is whether the timing of G.A.F.'s filing evidences an intent to delay or frustrate the legitimate efforts of its secured creditors to enforce their rights.

Here, the record shows that G.A.F. filed this bankruptcy case as a result of its rapidly deteriorating financial condition, with the goal of accomplishing a sale of substantially all of its business operations.  At the time of filing, it was experiencing declining revenues, declining profit margins, and increased expenses.  Within weeks of filing, in the face of further deterioration in its business and the loss of many customers, Dairyland substantially reduced the amount that it was prepared to pay to acquire the business, and G.A.F. withdrew its motion to approve the sale.  Instead, it began the orderly liquidation of its assets.

There can be no doubt that the Pension Fund is frustrated with what it sees as the diminishing likelihood of a full recovery of G.A.F.'s withdrawal liability owed to it.  And to be sure, there have been delays in the progress of the case.  But this is not the same as circumstances that evidence an intent by G.A.F. to delay or frustrate the efforts of secured creditors – or any creditor, including the Pension Fund – to enforce its rights, and ultimately, to be paid.

Accordingly, this factor does not support the conclusion that G.A.F. filed this bankruptcy case in bad faith.

*Whether G.A.F. Had Little or No Cash Flow*

The sixth *C-TC 9th Avenue* factor is whether when it filed this bankruptcy case, G.A.F. had little or no cash flow.

Here, as described above, the record shows that when G.A.F. filed this bankruptcy case its business operations were deteriorating rapidly – with declining revenues and profit margins and increased expenses.  But when this case began, G.A.F. was an operating business, with significant cash flows from its operations.

Accordingly, this factor does not support the conclusion that G.A.F. filed this bankruptcy case in bad faith.

*Whether G.A.F. Cannot Meet Current Expenses Including the Payment of Personal Property and Real Estate Taxes*

The seventh *C-TC 9th Avenue* factor is whether G.A.F. cannot meet its current expenses, including the payment of personal property and real estate taxes.

Here, as described above, the record shows that at the time this bankruptcy case was filed, G.A.F. was confronting a range of serious financial challenges.  As Mr. Seelig stated, "[w]ith available funds all but exhausted, Debtor now finds itself in need of the protections

afforded by the Bankruptcy Code." Seelig Aff. ¶ 27. But this situation – an operating business strained to the breaking point by increased expenses and decreased revenue – is not a sign of bad faith in seeking bankruptcy protection. Rather it is a characteristic, and perhaps even a common characteristic, of a business that seeks legitimately to reorganize in a Chapter 11 bankruptcy case.

Accordingly, this factor does not support the conclusion that G.A.F. filed this bankruptcy case in bad faith.

*Whether G.A.F. Has No Employees.*

The eighth *C-TC 9th Avenue* factor is whether G.A.F. has any employees

Here, the record shows that at the time this case was filed, G.A.F. had eighty-six employees and substantial, though diminishing, business operations.

Accordingly, this factor does not support the conclusion that G.A.F. filed this bankruptcy case in bad faith.

## Conclusion

For the reasons set forth herein, the Court concludes that the Pension Fund has not shown that G.A.F. has entered into a transaction that has the principal purpose of evading or avoiding its withdrawal liability to the Fund, as addressed in ERISA Section 4212.

For these same reasons, the Court concludes that the Pension Fund has not shown that G.A.F. filed this Chapter 11 bankruptcy case in bad faith under Bankruptcy Code Section 1112(b), in order to evade or avoid its withdrawal liability to the Fund under ERISA.

For these reasons, and based on the entire record, the Pension Fund's Motion to Dismiss is denied.  An order in accordance with this Memorandum Decision will be entered simultaneously herewith.



Dated: Brooklyn, New York
     March 19, 2020

              Elizabeth S. Stong
          United States Bankruptcy Judge